PER CURIAM.
The appellant, Ronnie Lynn Kirksey, appeals from his conviction for murder made capital because the victim, 23-month-old Cornell Norwood, was less than 14 years old. See § 13A-5-40(a)(15), Ala. Code 1975.
On February 18, 2010, the jury returned a. guilty verdict to murder made capital because the victim was less than 14 years old. Following the penalty phase of the trial, the jury unanimously found that the crime was especially heinous, atrocious, or cruel compared to other capital offenses and unanimously recommended that Kirk-sey be sentenced to death. On April 30, 2010, the trial court sentenced Kirksey to death. Kirksey appeals his conviction and sentence of death. After careful review, we affirm.
The evidence adduced 'at trial tended to show that, on Saturday, April 15, 2006, Kirksey lived with Yolanda Norwood at 313 North Sixth Place,.Apartment F, in Gadsden, Alabama. Also living there were S.J. and T.N., Yolanda’s minor daughters, and her infant son, Cornell. A kitchen, laundry room, and living room were located on the first floor of the apartment, and three bedrooms were on the second floor. At approximately 12:45 that afternoon, while the children were taking a nap and Yolanda was watching television, Kirksey left the apartment to rent a movie. Cornell awoke while Kirksey was gone. Kirk-sey returned with movies and a six-pack of beer. He took two beers and went upstairs with Cornell. Kirksey .did not ap *817 pear to be under the influence of alcohol at that time. .. .
Around 2:00 pirn., Yolanda and her daughters left the apartment, walking to a store to buy diapers for Cornell. ' When Yolanda got to the store, she discovered that she did not have enough money to pay for the diapers, so she and the girls walked back to their apartment. When they got to the apartment, they saw Kirksey and Cornell playing in the living room. After getting the additional money she needed from Kirksey, Yolanda returned to the store with her daughters. When Yolanda returned home from the store, she went upstairs to change Cornell’s diaper. At that time Kirksey and Cornell were lying on the bed watching television. While Yolanda was changing Cornell’s diaper, Kirk-sey asked her whether Cornell had a habit of biting his jaw or lip. Yolanda noticed some blood near Cornell’s mouth and wiped his mouth with a rag. She also observed that Cornell looked tired, as if he had just awakened. Yolanda went back downstairs and took her daughters to La-shonda Simmons’s apartment, which was two apartments down from her own apartment.
A few minutes later, Yolanda came back to her apartment; Kirksey came running down the stairs and told her that something was wrong with Cornell. Yolanda followed Kirksey back upstairs and found Cornell lying in the middle of the floor. Kirksey began performing cardiopulmonary resuscitation (“CPR”) on Cornell, whose eyes were closed and who was bleeding from his mouth. Yolanda told Kirksey to continue the CPR, and then', because she did not have a telephone, she ran to a neighbor’s apartment to call emergency 911. After placing the call, Yolanda went to Simmons’s apartment and told her daughters about Cornell’s .condition; then she returned to her own apartment, where she found Kirksey still performing CPR on Cornell, who was gasping for air. Kirksey paused long enough to use a rag to wipe blood from Cornell’s mouth and then continued CPR. Yolanda noticed blood on Kirksey’s T-shirt and on the floor beside Cornell’s head.
Three units from the Gadsden Fire Department (“GFD”) were dispatched to the apartment. After being informed that someone upstairs was not breathing, paramedics Melvin Colegrove and Wilburn Reed entered the apartment and went upstairs. They found that Cornell had ago-nal [1] respirations, a very weak pulse, and a very small amount of blood and vomit coming from his mouth. Colegrove spoke'with a black,male[2] who was in the bedroom, asking him what had happened to Cornell. The black male responded: “Well, I left the room, I come [sic] back in and he wasn’t breathing.” (R. 1380.) Jason McAlister, a fireman with the GFD who had entered the bedroom, took Cornell downstairs to an ambulance, where Cole-grove and Reed began administering fluids and medication intravenously, started performing CPR, and intubated Cornell. As Cornell was being brought downstairs, William Maddux, a GFD commander and paramedic, entered the apartment. Because the GFD had been dispatched in response to a “respiratory problem” and because Cornell was not breathing on his own, Maddux spoke with Kirksey in an attempt to get information about Cornell. (R.-1373.) Kirksey told Maddux that he did not know Cornell’s medical history and that he “was just there on weekends mostly:” (R. 1374.) Kirksey also told Maddux *818 that he had been watching movies with Cornell when he left the room to go to the bathroom; when he returned, he said, Cornell was on the floor.
Simmons drove Yolanda to Gadsden Regional Medical Center, where Cornell had been taken, while Kirksey stayed at the apartment. Doctors at that hospital decided that Cornell should be transported by helicopter to Children’s Hospital in Birmingham.' Kirksey arrived at Gadsden Regional Medical Center before the helicopter departed, but he did not speak to Yolanda. ■
After being notified "that personnel with the G1FD had requested an investigator, Detective Teri Farris, a juvenile investigator with the Gadsden Police Department (“GPD”), went to the trauma room at Gadsden Regional Medical Center, where she was shown the bruising on Cornell’s face.' Det. Farris " located Yolanda and asked her what had happened to Cornell. Yolanda responded: “I don’t know. I don’t know. I wasn’t there.” (R. 1432.) After the helicopter departed; Det. Farris told Yolanda that she needed to go to the apartment. ' '
When Yolanda arrived back at the apartment, she found Kirksey already there,, standing outside his truck; he did not speak to her. After giving Det. Farris and GPD support personnel permission to enter the apartment, Yolanda and Simmons obtained transportation to Children’s Hospital.
Inside the bedroom where Cornell had been treated by paramedics, Det. Farris and the GPD support personnel collected photographs and other, evidence. The only blood Det. Farris found in the bedroom was on a rag and T-shirt. Det. Farris went outside, where she found Kirksey. While obtaining his personal information, Det. Farris noticed the smell of alcohol on Kirksey’s breath. After a check revealed an arrest warrant for Kirksey’s failure ■ to appear for a hearing, Det. Farris had officers take Kirksey into, custody and transport him to the Etowah County Jail.
After Det. Farris learned from Yolanda that Kirksey and Cornell had been alone at the apartment, Det. Farris had Kirksey retained in custody. At 1:00 a.m. the next day, April 16, 2006, Det. Farris learned from Dr. Nancy Tofll that Cornell had died. Dr. Tofll also informed Det. Farris that Cornell’s skull had been fractured just behind his nose and that he had suffered massive brain swelling.
Yolanda’s daughters were placed in a “safety plan” by the Alabama Department of Human Resources. Det. Farris had Yolanda’s eight-yéár-old daughter taken to the Barrie Center for Children[3] for an interview.
Det. Farris also had an officer retrieve Yolanda and bring her to the GPD facility for questioning. Det. Farris conducted a lengthy interview .with Yolanda and had her write a statement. During the interview, Yolanda told Det. Farris about having walked with her daughters to the store to buy diapers for Cornell; Yolanda’s daughter had described this same event during her interview at the Barrie Center. Upon concluding the interview with Yolanda, Det. Farris went to the store indicated by Yolanda and viewed a video recording, taken by a surveillance camera, of Yolanda and her daughters in the store on the afternoon of April 15,
Det. Farris had Kirksey transported from the jail to her office at the GPD facility, where she advised him of his rights by reading from a waiver-of-rights form and then allowing him to read the form himself. Kirksey signed the form. During the initial interview that followed, Kirksey stated that, on the previous day, *819 after drinking four ’or five beers without having eaten anything, he had been in bed watching movies when he went into the bathroom.. When he returned, he said, Cornell was on the floor. Kirksey also told Det. Farris that he had asked Yolanda about Cornell having seizures and that Cornell had had a far away look in his eyes and had bitten his tongue. Det. Farris then asked Kirksey to write out a statement concerning' the events surrounding Cornell’s death. In that statement, Kirk-sey wrote:
“I awakeing Sat morning about 9:30 or 9:45 use the bathroom and want dohw stair’s got my breakfood and speak to the kids. I went back up stair’s to eat. Once I got done I put my plate away. An I back up stair to watch T.V. Some friend come over about 11:00 or 11:30 we were all up stair’s and the kid’s was in the old’s girld room playing I had a sode I gave them sum and I went back with the grow flok’s and I am going watch a move an take nap me and the lil one. So we watch the- move but the bady wood sleep a lil and wake-upJ I got up and went donw stair’s I said to Yolanda that I will B back I went to North Gaseden to the move store.' I got my moveins and I stop at the B.P. store got some beer once I got my beer my truck brack’s out so I went home. I walk- in the house Yolanda was feeding the kid’s the lil one had food all over him and she was going up stair’s to clean him up “So I put the beer away and went úp stair’s I pull off my shoe and I showed the move to Yolanda I got the bady and me an him lay down I got off into the move. I look at the baby he had far off look in his eye’s he was like that before so I did’t think it was something wrong so I started watching the move. I heard him griming his teeth so I look at him he had blood in he’s mouth I got up to clean he up and Yolanda came lip stair’s I had her look at him. She did but he still had that far away look in he eye’s. She want next door. She gone about 5 min when I went to the bathroom I was in there for about 10 min’s and when I came out he was on the flood moveing around not breathing I pull off my T shirt to clean his mouth an started C.P.R.
“Ronnie Kirksey”
(State’s Exhibit 2) (errors in original) (C. 225-26).
After Kirksey wrote out that statement, Det. Farris told him that Cornell’s skull had been fractured and, asked him how that had happened. Kirksey then told her that he had been roughhousing with Cornell, and, when asked what he meant by “roughhousing,” Kirksey replied: “I held him up over my head and he fell and he hit his head on the back of the headboard and it’s wood.” (R. 1483.) Kirksey further told Det. Farris that Cornell had cried a little but that he “came back for more” and that he had held him up, dropped- him, and that Cornell had hit his head again. (R. 1483.) Kirksey then wrote the following statement: -
“Before my girlfriend came back from the store we was playing he hit his head on the one head>boad but he acted fíne I stop playing with and check him out. An he look ok I started back watching the move.
“Ronnie Kirksey”
(State’s Exhibit 3) (errors in original) (C. 227).
On Monday, April 17, 2006, Det. Farris again had Kirksey transported from the jail to the GPD facility. Kirksey, after again being advised of and waiving his •rights,’wrote the following statement:
“I was playing with Nail [4] had him up over my head an he wood fall. We *820 pladed like that a few min and the last time I had him up he came down and hit his head on the head board so I stop and ask or you .Q.K. He was scary but .O.K. so I pick him up so he can stand up on the bed but his legs gave out on him and he fall once again I set him on the corne of the bed. And I walked in the bed room got my face rag to clean his trear’s and I lay back down on the bed beside him an started watching the move later he started makeing sound’s so I look over he had blood in his mouth I got up again to clean him mouth. I few min later his mom came in I told her about the blood an she check him out. An he was O.K. with her.
“Ronnie Kirksey”
(State’s Exhibit 6) (errors in original) (C. 231).
Following her interview of Kirksey, Det. Farris spoke by telephone with the State of Alabama Department of Forensic Sciences medical examiner, Dr. Adel Shaker, who was scheduled to perform the autopsy -of Cornell later that day, Det. Farris informed Dr, Shaker that she had been' told that Cornell’s head had struck a headboard. After the autopsy had been completed, Det. Farris again spoke with Dr. Shaker, In that, conversation she learned that Cornell had suffered many injuries, including massive internal injuries, which had been caused by a lot of force. Based on the information she had obtained, Det. Farris obtained a warrant for Kirksey’s arrest on a charge of capital murder.
On Tuesday, April 18, 2006, Det. Farris went, to the jail to serve the warrant on Kirksey. After serving the warrant, she asked Kirksey: “Ronnie, this is the last time, you’re .going to see me. Is there anything else you want to — do you want to talk to me again or anything?”. (R. 1503.) As Det. Farris was preparing to leave, Kirksey replied: “I do.” (R. 1503.) Det. Farris again had Kirksey transported to the GPD facility where he executed another waiver-of-rights form.
Following 'Kirksey’s execution of the waiver-of-rights form, Det. Farris informed' Kirksey that Cornell had sustained internal injuries. Kirksey told her that he “really had more like eight beers” and that he had been drinking on ¿n empty stomach. ' (R. 1509.) Kirksey then relayed the story of Yolanda’s having gone to the store and said that 'Cornell had hit his head while they were “roughhoúsing.” Based on the information she had obtained from Dr. Shaker, Det. Farris asked Kirksey whether he had punched Cornell; he replied: “I kicked him.” (R. 1511.), Kirksey went on to say that, after the “roughhousing” incident, Cornell began whining and Kirksey took him to the bathroom and stood him on the commode. Cornell, who was . still whining, put his arms out for Kirksey to take him but Kirksey refused to do so, telling Cornell to get down by himself. Kirksey stated that-he did this to show Cornell some independence. Kirk-.sey -said that Cornell then fell on the floor and began crying, that Kirksey picked him up and stood him on his feet, but that Cornell lay back down on the floor crying. Kirksey then told Det. Farris that “[t]hat pissed, me off’ and that, then, he had kicked Cornell. (R. 1512.)
D.et. Farris reviewed with Kirksey the internal injuries Cornell had received and told him to tell her how those injuries happened. He replied: “I stood on him.” (R. 1514.) Kirksey, who sáid that he had been wearing socks, then demonstrated how he had stepped onto Cornell. After stepping on Cornell, he said, he slipped off because he had been drinking, but then, he said, he stepped back on Cornell and stayed on him until he saw blood coming from Cornell’s mouth and nose. He then got off Cornell and put him back in bed. At some point during, the interview, Kirk- *821 sey also told Det. Farris that he had fallen while running with Cornell. Kirksey said that, after putting Cornell back in bed, he laid back down with him and began watching the movie until he saw that Cornell’s hands had begun to curl up and that he was twitching. Kirksey told Det. Farris that, after Yolanda came into the bedroom," he noticed that Cornell had quit breathing and he began performing CPR on him. When asked, Kirksey denied having thrown Cornell down the stairs and said that Cornell had not fallen down the stairs. Det. Farris asked Kirksey to write out what he had said during that interview. He wrote:
“I had 4 beer’s after gone to the shop to get 6. Once home I had 4 more when I drink I like to eat but went nothing in my stomp it was like I was someone else and. I had Nail up to the bedroom, me. an the bady lay down he was graining his teeth he had blood in his mouth we was in the bathroom I got him clean up and I put down so he want me to pick him up I said no and come on he "was on the floor I hit him so he tryed to get up but I put my foot on him he cryed Some I stop and I pick him up I had him in my right arm and started ranning with him. I tryed to stop but failed on him I got up but he was bleeding I look at him 4 about 5 min I ran down stair’s to get the mother and we both came back up stair’s I try C.P.R. she called 911 I’m sorriy When I Say hit I mean kick him. And my foot was on him an my hole 175 or 180 was on him. And his lit hand was curled up so I stop I need you to know I can’t stop seeing he’s lil face in my head. He was more then my step son I love him like my own. An I’m not asking to be free I’m asking you. To send me to. him as soon as you can.
“Ronnie Kirksey”
(State’s Exhibit 8)(errors in original)(C. 233).
Dr. Shaker performed the autopsy of Cornell on Monday, April 17, 2006. While conducting an external examination of Cornell’s body, Dr. Shaker discovered contusions on both cheeks, the lower lip, and around Cornell’s eye. He also detected a lacerated wound on the right side of Cornell’s scalp and saw that his upper central incisors had been dislocated.
During the internal examination of Cornell’s body, Dr. Shaker discovered blood in the subcutaneous area of the scalp; this indicated that the bleeding had occurred While Cornel! was alive. He also found a linear fracture of Cornell’s skull. Dr. Shaker found bleeding on the brain that was more significant on the right side. Dr. Shaker opined that that injury had beén • inflicted by marked force trauma.
While examining Cornell’s chest and abdominal cavities, Dr. Shaker found blunt-force injuries thát had affected Comell’s heart, aorta, pancreas, and liver. He also found contusions on the' right lung, the diaphragm and the mesentery, as -well as blood inside Cornell’s abdomen; that blood had caused Cornell’s abdominal cavity to become distended. Based upon the findings he made during the autopsy, Dr, Shaker concluded that the cause of Cornell’s death was “blunt force trauma to the head.” (R. 1673.) He further concluded that, had Cornell not died from the injury to his head, he would have died from the internal injuries he suffered;

Standard of Review

Because Kirksey has been sentenced to death, we must search the record for “plain error” pursuant to Rule 45A, Ala. R.App. P., which reads:
“In all cases in which the death penalty has been imposed, the Court of Criminal Appeals shall notice any plain error •or defect in the proceedings under review, whether or not brought to the attention of the trial court, and take *822 appropriate appellate action by reason thereof, whenever such error has or probably has adversely affected the substantial right of the appellant.”
(Emphasis added.)
In Ex parte Brown, ll'So.3d 933 (Ala. 2008), the Alabama Supreme Court explained:
“ ‘ “To rise to the level of plain error, the claimed error must not only seriously affect, a defendant’s ‘substantial rights,’ but it must also have an unfair prejudicial impact on the jury’s deliberations.” ’ Ex parte Bryant, 951 So.2d 724, 727 (Ala.2002) (quoting Hyde v. State, 778 So.2d 199, 209 (Ala.Crim.App.1998)). In United States v. Young, 470 U.S. 1, 15, 105 S.Ct. 1038, 84 L.Ed.2d 1 (1985), the United States Supreme Court, construing the federal plain-error rule, stated:
“ ‘The Rule authorizes the. Courts of Appeals, to correct only “particularly egregious errors,” United States v. Frady, 456 U.S. 152, 163 (1982), those errors that “seriously affect the fairness, integrity or public reputation of judicial proceedings,” United States v. Atkinson, 297 U.S. [157], at 160 [ (1936) ]. In other words, the plain-error exception to the conterhporaneous-objection rule is to be “used sparingly, solely in those'circumstances in which a miscarriage of justice would otherwise result.” United States v. Frady, 456 U.S., at 163, n. 14.’ ’
“See also Ex parte Hodges, 856 So.2d 936, 947-48 (Ala.2003) (recognizing that plain error exists only if failure to recognize the error would ‘seriously affect the fairness or integrity of- the judicial proceedings,’ and that the plain-error doctrine is to bd ‘used sparingly, solely in those circumstances in which a miscarriage of justice would otherwise result’ (internal quotation marks omitted)).”
Ex parte Brown, 11 So.3d at 938.
“The standard of review in reviewing a claim under the plain-error doctrine is stricter than the standard used in reviewing an issue that was properly raised in the trial court or on appeal” Hall v. State, 820 So.2d 113, 121 (Ala.Crim.App.1999). Although Kirksey’s failure to object will not bar this Court from reviewing any issue, it will weigh against any claim of prejudice. See Dill v. State, 600 So.2d 343, 352 (Ala.Crim.App.1991).
We will address the issues in the order that they arose at trial.
I.
Kirksey contends, in the eleventh issue raised in his appellate brief, that the trial court erred in denying his motion for change of venué; He argues on appeal, as he did at trial, that
“Kirksey’s case was the third capital murder prosecution involving the death of a child tried in Etowah County within a four-month period. (C. 85.) The two previous trials resulted in guilty verdicts. At the time of Mr. Kirksey’s trial, one of those two defendants had already been sentenced to death, and the other was scheduled for sentencing three days before Mr. Kirksey’s jury venire was to be assembled. (Id.) There was extensive local and state media coverage about these trials.”
(Kirksey’s brief, p. 84-85.)
Rule 10.1(b), Ala. R.Crim. P., provides that “[t]he burden is upon the defendant to show to the reasonable satisfaction of the court that a fair and impartial trial and an unbiased verdict cannot be reasonably expected in the county in which the defendant is to be tried.” “Absent a showing of abuse of discretion, a trial court’s ruling on *823 a motion for change of venue will not be overturned/’ McMillan v. State, 139 So.3d 184, 242 (Ala.Crim.App.2010) (quoting Ex parte Magwood, 426 So.2d 929, 931 (Ala.1983)).
“In connection with pretrial publicity, there are two situations which mandate a change of venue: 1) when the accused has demonstrated ‘actual prejudice’ against him on the part of the jurors; 2) when there is ‘presumed prejudice’ resulting from community saturation with such prejudicial pretrial publicity that no impartial jury can be selected. Sheppard v. Maxwell, 384 U.S. 333, 86 S.Ct. 1507, 16 L.Ed.2d 600 (1966); Rideau [v. Louisiana, 373 U.S. 723 (1963)]; Estes v. Texas, 381 U.S. 532, 85 S.Ct. 1628, 14 L.Ed.2d 543 (1965); Ex parte Grayson, 479 So.2d 76, 80 (Ala.), cert. denied, 474 U.S. 865, 106 S.Ct. 189, 88 L.Ed.2d 157 (1985); Coleman v. Zant, 708 F.2d 541 (11th Cir.1983),”
Hunt v. State, 642 So.2d 999, 1042-43 (Ala.Crim.App.1993).
A.
Kirksey contends, as he did in his motion, that a change of venue was proper, not because of pretrial publicity about his case but, rather, because of publicity regarding other capital cases in which the victim was a child that had been tried in Etowah County. He specifically argues that guilty verdicts in two recent factually similar cases and the media coverage of those cases “was sufficient to give rise to a presumption of prejudice.” (Kirksey’s brief, p. 85.)
“When a defendant alleges that ‘presumed prejudice’ exists, the defendant must show that pretrial publicity is sufficiently prejudicial and inflammatory and that the prejudicial pretrial publicity saturated the community where the trial was to be held. Coleman v. Kemp, 778 F.2d 1487 (11th Cir.1985). ‘ “Publicity” and “prejudice” are not the same thing. Excess publicity does not automatically or necessarily mean that the publicity was prejudicial.’ Hunt v. State, 642 So.2d [999] at 1043 [ (Ala.Crim.App.1993)]. Rather, a defendant alleging presumed prejudice must show that ‘a feeling of Seep and bitter prejudice exists in [the county] as a result of the publicity.’ Ex parte Fowler, 574 So.2d 745, 747 (Ala.1990), citing Holladay v. State, 549 So.2d 122 (Ala.Crim.App.1988), aff'd, Ex parte Holladay, 549 So.2d 135 (Ala.1989).
“In determining whether the ‘presumed-prejudiee’ standard exists the trial court must consider the totality of the surrounding circumstances. Patton v. Yount, 467 U.S. 1025, 104 S.Ct. 2885, 81 L.Ed.2d 847 (1984); Murphy v. Florida, 421 U.S. 794, 95 S.Ct. 2031, 44 L.Ed.2d 589 (1975); Irvin v. Dowd, 366 U.S. 717, 81 S.Ct. 1639, 6 L.Ed.2d 761 (1961), The presumptive-préjudiee standard is ‘rarely applicable, and is reserved for only ‘extreme situations.’ Coleman v. Kemp, 778 F.2d at 1537.”
Woodward v. State, 123 So.3d 989, 1050 (Ala.Crim.App.2011).
In his motion, Kirksey alleged that there had been extensive media coverage of two other recent capital-murder cases in Eto-wah County, in which Kirksey'was not the defendant, and that the sentencing hearing in one of those cases, scheduled for February '2, 2010, would also receive local and statewide media coverage. Attached to the motion was a copy of a single item from the Web site www.GadsdenTimes. com, entitled “Puttiii'g a stop to abuse— Child deaths on rise, time to find a prevention.” (C. 88.)[5] That item was posted on *824 the Web site on October 22, 2009, more than three months before Kirksey’s trial began. Kirksey did not assert that there had been extensive media coverage of his case; in 'fact, he did not argue that there had been any media coverage of his case.
Kirksey did not establish that the community was so saturated with pretrial publicity about his case that there existed actual prejudice against him. In fact, Kirksey presented nothing to support a claim of presumed prejudice, and there is nothing in the record suggesting the presence of actual prejudice. Accordingly, the trial court did not abuse its discretion in denying Kirksey’s motion for a change of venue based alleged prejudice caused by media coverage.
B.
Kirksey contends that the trial court erred to reversal because it did not consider the motion for a change of venue until after voir dire had concluded. Kirksey argues that by not considering the motion until after voir dire, the trial court lost the opportunity to ascertain,through voir dire questioning “the degree to which the jurors had been exposed to prejudicial publicity, and how such exposure had affected the juror’s attitude towards the' trial.” (Kirksey’s brief, p. 86) (quoting Coleman v. Kemp, 778 F.2d 1487, 1542 (11th Cir.1985)).
Before voir dire, the veniremembers were asked to swear or affirm their answers to .60 questions contained in the juror questionnaire submitted by Kirksey. Question 25 was: “Do you recall hearing or reading anything in the news about this case?” (C. 364.) That question contained four subparts: subpart (a) — “Have you discussed this case with someone who knew something about the facts of this case?”; subpart (b) — “Do you know anything about the facts of this case except what you have heard in court today?”; subpart (c) — “Have you discussed this case with any of your fellow jurors?”; and sub-part (d) — “Have you heard anyone discussing this case?” (C. 371.) Question 46 also consisted of four subparts: subpart (a)— “Have you read anything or heard anything about this Defendant, Ronnie Lynn Kirksey, in the newspapers, radio, or on television?”; subpart (b) — “Have you discussed this Defendant, Ronnie Lynn Kirk-sey, with someone who knew anything about him?”; subpart (c) — “Do you know anything about this Defendant, Ronnie Lynn Kirksey, except what you have heard in Court today?”; and subpart (d) — “Have you discussed this defendant, Ronnie Lynn Kirksey, with any of your fellow juror's?” (C. 371.)
A review of all the questionnaires indicates that two veniremembers, F.W. and M.T.M., affirmatively answered that they had read about Kirksey’s case in a newspaper or had heard about the case through some media source or from another person. The trial court was aware that the completed questionnaires indicated that, but for those two veniremembers who were ultimately struck for cause, the veni-re was lacking in knowledge of this case. (R. 1193-94.) Therefore, the trial court did hot commit error by not questioning the veniremembers on a subject that they had already denied having knowledge of in the questionnaires. The record discloses no error relating to the trial court’s actions in this regard.
C.
Kirksey further alleges error in the trial court’s denial of his motion to continue (C. 90), filed due to “extensive media coverage” of the two unrelated capital cases.
“[A] motion for a continuance is addressed to the sound discretion of the trial court and ..., absent a showing of abuse of that discretion, the trial court’s decision *825 on the matter will not be overturned on appeal.” Smith v. State, 698 So.2d 189, 205 (Ala.Crim.App.1996). See also Busby v. State, 412 So.2d .837 (Ala.Crim.App.1982). “A defendant appealing the denial of a continuance must demonstrate a clear abuse of the trial judge’s discretion and make a specific showing of prejudice.” Tucker v. State, 429 So.2d 1165, 1169, (Ala.Crim.App.1983). See also Dolvin v. State, 391 So.2d 666, 674 (Ala.Crim.App.1979) (“actual jury prejudice” must be shown to .warrant a continuance)..
Kirksey argues-that the-“trial court erred by refusing, at a minimum,-to grant a short continuance until the media coverage subsided and Mr. Kirksey could be tried in a less prejudicial atmosphere.” (Kirksey’s brief, p. 86.) “Newspaper or other publicity does not, per se, constitute grounds for a continuance.”’ Busby v. State, 412 So.2d 837, 842 (Ala.Crim.App.1982). As set forth abové, Kirksey did not establish prejudice, actual or presumed, based on pretrial publicity regarding his or other trials. Absent a-showing of actual or presumed prejudice, we conclude that the trial court did not abuse its discretion in denying Kirksey’s motion for a continuance.
n.'
Kirksey contends[6] that the trial court erroneously denied various pretrial motions.
A.
Kirksey asserts that the trial court erred in denying his “Motion to Allow the Defendant to View the Scene of the Crime with his Attorneys.” (C. 78-79.) He argues that the denial of that motion was a violation of his “Sixth Amendment right to the effective assistance of counsel.” (Kirk-sey’s brief, p. 97.)
We review a trial court’s decision to deny a defendant the opportunity to visit a crime scene for abuse of discretion. See Swicegood v. State, 448 So.2d 433, 435 (Ala.Crim.App.1984); see also Vanpelt v. State, 74 So.3d 32, 37 (Ala.Crim.App.2009).
On December 11, 2009, Kirksey filed a “Motion to Allow the Defendant to View the Scene of-the' Crime with His Attorneys.” (C. 78-79.) In that -motion, Kirk-sey asserted that “the facts of [ ]his case are so complicated that there is no way for the Defendant to explain the situation to his attorneys properly in a manner whereby they could take pictures, take measurements, or otherwise properly investigate the scene bf the alleged crime without his assistance.” (C. 78.) The trial court held a hearing on- that motion on January 15, 2010. During that hearing, defense counsel informed the court that the housing authority, which had oversight of the apartment where the crime occurred, and the current tenant had made no objection when defense counsel had requested to go into the apartment with Kirksey to view the scene of the crime. Regarding the current condition- of the apartment, the apartment manager had informed defense counsel that “nothing has changed but the paint ... [so,] it’s close to what it was when [Kirksey lived] there.” (R. 118.) Defense counsel argued that Kirksey needed to be present during the viewing of the crime -scene to “walk-through his steps of what happened” (R. 114) and to give “his point of view on the activity.” (R-. 118.) Defense counsel further argued:
“And' it’s — the timing, the spacing and everything within that apartment.... I don’t know if it’s this big or if it’s, you know, this "big (indicating).' And there’s different actions 'and what might, you know, what a person could do in there and what they cbuldn’t do in there as to *826 limitations in the room or anything else. And [Kirksey’s] the only person who would know that.”
(R. 118-119.)
The prosecutor argued in response that the alleged benefit of taking Kirksey to the crime scene would be greatly outweighed by- the potential risk of harm to members of the neighborhood-and that taking Kirk-sey. to the crime scene would require a multitude' of police officers to attempt to secure the neighborhood. The prosecutor suggested that, instead of Kirksey’s' personally going to the crime scene, a videotape and photographs be made of- the apartment. On January 19, 2010, the trial court denied Kirksey’s motion but did allow his defense counsel to view the crime scene and to take photographs and make a video recording of the apartment.
We do not find that allowing Kirksey to view the crime scene in order to walk his counsel through the events surrounding the murder and to clarify the timing and scald of events was a compelling reason in this case to grant the motion. In Minor v. State, 780 So.2d 707 (Ala.Crim.App.1999), reversed on other grounds, 780 So.2d 796 (Ala.2000), the -defendant had, in a pretrial motion asking to visit the crime scene, asserted ‘-‘[t]hat the facts of this case are so complicated that there is no way for the Defendant to properly explain the situation to his. defense attorneys in a manner whereby they could take pictures, take measurements, or otherwise properly investigate the scene of the alleged crime without his assistance.” Minor, 780 So.2d at 727. The “trial court [had] ordered that arrangements be made for Minor to view a videotape-of the crime scene with his attorneys.” Id. This Court upheld the trial court’s decision because the defendant had failed to “offer any compelling reason why his presence at the crime scene was necessary nor did he offer any specific explanation as to how his defense was prejudiced by his not being allowed to view the scene.” Id.
In Dorsey v. State, 881 So.2d 460 (Ala.Crim.App.2001), reversed on other grounds, 881 So.2d 538 (Ala.2003), this Court, in addressing a similar claim of error, upheld the trial court’s decision. In Dorsey, the defendant had filed a motion requesting that he be allowed to visit the crime scene. The grounds, if any, supporting the motion are not disclosed in Dorsey. The prosecutor did not-object to defense attorneys or* investigators visiting the crime scene, but the prosecutor objected to Dorsey’s doing so because the victim’s family still lived in the residence that was the. crime scene. “[T]he trial court refused -.to allow Dorsey to visit the crime scene but said' that if his attorneys had a problem viewing the scene they could come to him for help. There is no further discussion of this motion in the record.” Dorsey, 881- So.2d at 476. In upholding the -trial court’s ruling, this Court, citing Minor, held that Dorsey had neither presented a compelling reason necessitating that he visit the crime scéne nor explained how his defense would suffer prejudice -if he did not. Moreover, this Court-, noted that “pursuant to the discovery order Dorsey had access to photographs and a videotape of the crime scene.” Id.
As in Minor and Dorsey, nothing in the record in this case discloses that defense counsel’s concerns could not have been sufficiently addressed through showing Kirksey the video recording and photographs of the crime scene. Thus, the record does not disclose that the denial of Kirksey’s motion to view the crime scene amounted to an abuse of discretion by the trial court.
B.
Kirksey contends that the trial court erred in denying his motion .seeking to *827 require the State to “Disclose the Past and Present Relationships, Associations, -and Ties Between the District Attorney and Prospective Jurors.” (C. 148-150; ,R. 223.) We review the trial court’s ruling for an abuse of discretion. See Belisle v. State, 11 So.3d 256, 277 (Ala.Crim.App.2007), aff'd, 11 So.3d 323 (Ala,2008).
When discussing this motion, the trial court commented:
“I just think we have to keep the -responsibility and the burden on the person you’re asking the questions to. And since you’re not limited on asking those questions, you can ask all those relationships you want to. We’ll have to rely on the members of the venire to disclose the things they know.”
(R. 223.)
The first part of Question 42(a) of the juror questionnaire asked each venire-member: “Are you or is any member of your immediate family related by blood or marriage; or do you or any member of your immediate family know the District Attorney Jimmy Harp or any member of his staff?” (C. 369.) The second part of the Question 42(a) listed the names of staff members of the district attorney’s office. Question 42(b) asked: “Have you or had any member of your immediate family ever had any contact with any prosecutor, or are friends with them or any member of their staff?” (C. 369.) Moreover, “the least intrusive méthod óf discovering a juror’s past or present relationship with any of the prosecution' team is to ask the prospective jurors during voir dire examination.” Belisle v. State, 11 So.3d at 277. In addition to the information obtained from the juror questionnaire, -Kirksey was given adequate opportunity. to expose through voir, dire questioning any past or current association or relationship between venire-members and members of the district attorney’s office.
Thus, the record does not disclose that' the denial of Kirksey’s motion requesting to -have the State provide information regarding associations* with veniremembers amounted to an abuse of discretion by the trial court. ’ •
C.
Kirksey contends that the trial court erred when it denied his “Motion for the State to Reveal All Mitigating Circumstances.” The motion asserted, in pertinent part:
“[T]he State has an ongoing obligation to turn over any information favorable to Mr. Kirksey with regard to the sentencing’ phase of his trial. Mr, Kirksey therefore moves that this Court order the prosecution to disclose tó undersigned counsel and permit him access to all mitigating evidence or information that would lead to the discovery of mitigating evidence.”
(C. 96.) Kirksey specifically requested the following:
“(z) In addition to the mitigating circumstances specified in section 13A-5-51, [Ala.Code 1975,] mitigating circumstances shall include any aspect of a defendant’s character or record and any of the circumstances of the offense that the defendant offers as a basis for a sentence of life imprisonment without parole instead of death, and any other relevant mitigating circumstance which the defendant offers as a basis for a sentence of life imprisonment without parole instead of death, Ala.Code [1975] § 13A-5-52; and
“(aa) any and all information support- , ing the existence of any other nonstat-utory mitigating circumstance. See Parker v. Dugger, 498 U.S. 308 (1991).
*828 “7. Through this motion, Mr. Kirksey seeks to anticipate any type of evidence favorable to Mr. Kirksey that the State maintains or might acquire. Because Mr. Kirksey is entitled to present any mitigating evidence and the jury is entitled to' hear the same, Mr. Kirksey respectfully requests that this Court direct the State to provide all information that may have an impact on the jury’s sentencing determination.
“For these reasons, Mr. Kirksey respectfully requests that this Court order the production of information relevant to Mr. Kirksey’s sentencing phase presentation.”
(C. 98.)
At the January 15, 2010, hearing on this motion, Kirksey stated that he would rely on the argument in his motion as support for granting the motion. At the hearing the prosecutor stated that the previously ordered open-file policy “should resolve” the request, because, the prosecutor asserted, “if it’s in our file, they can have access to it.” (R. 109.) The. trial court stated on the record that it was somewhat unfair to place the burden on the State to set forth evidence of nonstatutory mitigation, because, it noted, what the defense might argue to be a mitigating factor and what the jury might find to be a mitigating factor “is unlimited.” (R. 110.) The trial court asked defense counsel if the State’s open-file policy would satisfy the motion. Defense counsel responded that it viewed the State’s obligation to inform defense counsel of mitigating evidence the same way it viewed the State’s responsibility to disclose exculpatory evidence; that is, if the State obtained information regarding potential mitigating evidence, regardless of its form, i.e., written or oral, it had a duty to inform defense counsel. The prosecutor responded: “I can’t imagine what we would know about [Kirksey] that he doesn’t know about himself. It’s just hard to know what that entails.” (R. 111.) The trial- court stated td defense counsel that it was the trial court’s “expectation that y’all are going to have a lot bigger handle on what’s mitigating than probably -the State does.” (R. 112.) - Then the following colloquy occurred:
“MR. REID [the prosecutor]: I mean, if we talked to somebody who knew him and said, ‘Well, he spent the afternoon with my kids one day and didn’t beat them,’ • I mean,, is that mitigating, you know, it’s — r'
“MR. PENTECOST [defense counsel]: Yes.
“THE COURT: Yeah.
“MR. REID: Well, we’ll take it.
“THE COURT: Okay. I think I can handle that one then. ’
“Anything else anybody wanted to say about that?”
(R. 112.) There" was no further discussion of this motion.
The trial court entered a written order denying the motion that stated: “The Open File Discovery Order resolves the issues in the Defendant’s Motion for the State to Reveal all Mitigating Circumstances; therefore said motion is hereby DENIED.” (C. .102.) On appeal, Kirksey contends that, by limiting the State’s duty to disclose potential mitigation evidence to the information documented within the State’s case file, “[t]he trial court unlawfully impaired Mr. Kirksey’s ability to present a mitigation case, and violated his constitutional right to exculpatory information in "the possession of the prosecution.” (Kirksey’s brief, p. 99.)
It appears-from the discussions at the hearing that the prosecutor acquiesced to provide any apparent mitigation evidence not contained in the State’s case file. Kirksey has not identified any mitigating evidence withheld by the State nor alleged that the State actually withheld mitigating *829 evidence. Moreover, from this Court’s review of the record, it is not apparent that any potential mitigating evidence was withheld from Kirksey.
Thus, the record does not disclose that the denial of Kirksey’s motion requesting that the State provide to defense counsel information recognized by the State to be potential mitigating evidence but existing outside the State’s case file amounted to an abuse of discretion by the trial court.
D.
Kirksey contends that he was denied his right to a fair trial and an impartial jury when the trial court refused to allow him to conduct individual, sequestered voir dire examination of the venire in order to determine whether prospective jurors had been affected by pretrial publicity.
In Alabama,
“ ‘ “[tjhere is no requirement that a defendant be allowed to question each prospective juror individually during voir dire examination. This'' rule applies to capital eases, and the granting of a request for individual voir dire is discretionary with the trial court.’’ Coral v. State, 628 So.2d 954, 968 (Ala.Crim.App.1992), aff'd, 628 So.2d 1004 (Ala.1993).’ ”
Vanpelt v. State, 74 So.3d 32, 51 (Ala.Crim.App.2009) (quoting Sneed v. State, 1 So.3d 104, 135 (Ala.Crim.App.2007)). “A teal court is vested with great discretion in determining how voir dire examination will be conducted, and that court’s decision on how extensive a voir dire examination is required will not be overturned except for an abuse of that discretion.” Ex parte Land, 678 So.2d 224, 242 (Ala.1996).
The record reflects that during a pretrial hearing Kirksey argued for individual, sequestered voir dire' examination of all prospective jurors due to alleged publicity surrounding the murder of young children in the local community in recent months. Kirksey asserted that the absence of individual, sequestered voir dire would create the risk that one veniremember’s prior knowledge about the case would contaminate the impartiality of the other venire-members. The trial court denied the motion, but it provided that, as an alternative, counsel would be allowed to conduct individual, sequestered voir dire of those veniremembers who, while part of a panel, disclosed that they had heard about Kirk-sey’s case or the other recent murder cases involving children.
Kirksey argues on appeal that, because of press coverage regarding “two other capital murder trials in Etowah County, both of which involved the deaths of young children and sentences of death,” the denial of the motion was a deprivation of “his constitutional right to a fair trial by an impartial jury.” (Kirksey’s brief, p. 99.)
As in the capital case of Burgess v. State, 811 So.2d 557, 569 (Ala.Crim.App.1998), aff'd in part, rev’d in part on other ground, 811 So.2d 617 (Ala.2000), Kirksey
“offered no evidence, either at trial or on appeal, to show how he was prejudiced as a result of prospective jurors being questioned in panels, as opposed to being questioned individually in a sequestered setting. On appeal, he has offered only general arguments concerning the possibility of prejudice and has failed to show that any comments by a prospective juror improperly influenced other members of a panel. He has presented no proof that the pretrial publicity was so extensive that the method of voir dire was inadequate to assure juror impartiality.”
The juror questionnaires disclosed only two veniremembers with some prior knowledge of the case. Those venire-members voiced no comments during voir diré questioning to contaminate the venire with-bias against Kirksey, and, moreover, those veniremembers were removed for *830 cause. Additionally, the trial court did not deny all individual voir dire, it ruled only that individual voir dire would be allowed where appropriate.
Thus, the record does not disclose that the denial of Kirksey’s motion requesting individual sequestered voir dire amounted to an abuse of discretion by" the trial court.
E.
Kirksey contends that the trial court erred when it denied his “Motion to Dismiss Indictment for Systematic Under-Representation of Cognizable Groups in the Composition of .the Grand Jury.” This argument is based on “Etowah County’s practice of excusing self-employed people,” which, Kirksey argues, is unconstitutional because “it does not produce a grand jury pool that is a fair cross-section of the community.” (Kirksey’s brief, p. 100.) In the order denying this motion, the trial court wrote that it was denying the motion because: 1) there was “no indication' that the circuit wide policy of allowing self employed persons to be excused from jury duty results in an exclusion of person[s] sharing a common viewpoint which could not be adequately represented by . other segments of the jury pool” and 2) self-employed persons “are not excluded from the jury pool” but,- rather, “áre excused, at their request, on a case by case basis.” (C. 159.) The trial court also explained that the Circuit Court of Etowah County “use[s] the driver’s' license records obtained from the [State of Alabama] Department of Public Safety” to obtain its venire. (C. 160.)
We have noted:
“ ‘[T]he fair cross-section requirement “ensures only a venire of randomness; one free of systematic exclusion. . It does not ensure any particular veni-re.” Note, United States v. Gelb: The Second Circuit’s Disa/ppointing Treatment of the Fair Cross-Section Guarantee, 57 Brook.L.Rev. 341, 343 n. 7 (1991). “Rather than being entitled to a cross-sectional venire,” a defendant “has a right only to a fair chance, based on a random draw, of having a jury drawn from a representative panel.” Comment, The Cross-Section Requirement and Jury Impartiality, 73 CaLL.Rev. 1555, 1565 (1985). See Johnson v. State, 502 So.2d 877, 880 (Ala.Cr.App.1987) (venire need not be “ ‘a perfect mirror of the community or accurately reflect the proportionate - strength of every identifiable group’ ”). Cf. United States v. Percival, 756 F.2d 600, 615 (7th Cir.1985)(“It is the master jury wheel, not the actual grand jury, which must represent a fair cross section of the community. So long as the master jury wheel is adequate and the prescribed procedure is thereafter followed, there can be no complaint that the panel ultimately produced by random selection is somehow underrepresentative in result.”) (citations omitted).’
“[Sistrunk v. State,] 630 So.2d [147] at 149-50 [(Ala.Crim.App.1993)]. ‘When raising a claim under [the fair-cross-section] requirement, a defendant “has the burden of establishing a prima facie case of a ‘fair cross section’ violation.” ’
Id. at 149, quoting Pierce v. State, 576 So,2d 236, 241 (Ala.Crim.App.1990).
“ ‘In order to establish a prima facie violation of the fair-cross-section requirement, the defendant must show (1) that the group alleged to be excluded is a “distinctive” group in the community; (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) that this underrepresentation is due to systematic exclusion of the group in the jury-selection process.’
*831 “Duren v. Missouri, 439 U.S. 357, 364, 99 S.Ct. 664, 58 L.Ed.2d 579 (1979).”
Gavin v. State, 891 So.2d 907, 945-46 (Ala.Crim.App.2003).
“The Duren Court defined systematic exclusion as exclusion that is ‘inherent in the particular jury-s'electión process utilized.’” Gholston v. State, 57 So.3d 178, 181 (Ala.Crim.App.2010) (quoting Duren v. Missouri, 439 U.S. 357, 366, 99 S.Ct. 664, 58 L.Ed.2d 579 (1979)). The jury pool in Etowah County is randomly drawn from a list of licensed drivers. We have “repeatedly held that the random drawing of veniremembers from a list of licensed drivers satisfies the fair-cross-section requirement.” Gholston, 57 So,3d at 181, Here, the trial court explained in its order that veniremembers who are self-employed “are excused, at their request, on a case by case basis.” (C. 159.) Because self-employed persons “are not excluded from the jury pool,” which consists of randomly selected citizens of Etowah County, there is no systematic exclusion. (C. 159.)
We hold that it was not error for the court to deny Kirksey’s motion.
III.
Kirksey contends that the death-qualifying process produced a jury that was prone to convict him.[7] While recognizing that “the United States Supreme Court approved the death-qualification of jurors” in Lockhart v. McCree, 476 U.S. 162, 106 S.Ct. 1758, 90 L.Ed.2d 137.(1986), he argues that “social science evidence has since shown that death-qualified juries are significantly more prone to convict than ordinary juries, are more receptive to statutory aggravating circumstances, and are less likely to consider non-statutory mitigating circumstances.” (Kirksey’s brief, pp. 95-96.) He further argues that “the death-qualification process reduces jury diversity by disproportionately excluding minorities and women.” (Kirksey’s brief, p.. 96.)
Because “[w]e have repeatedly upheld the practice of death-qualifying prospective jurors in a capital-murder case,” Scott v. State, 163 So.3d 389, 425 (Ala.Crim.App.2012), this claim is without merit. There was no error in death-qualifying the veni-re,
IV.
Kirksey contends, in the sixth, issue in his brief, that the trial. court’s refusal to remove potential jurors B.N, and B.B. from the venire created an unfair jury-selection process. He specifically argues that “[t]he trial court’s erroneous- denial of [two] for-cause challenges unfairly restricted Mr. Kirksey’s ability'to exercise his peremptory strikes and violated his right to a fair jury selection process.” (Kirk-sey’s brief, p. 61.)- We have explained that:
“““A trial judge’s finding on whether or not a particular juror is biased “is based upon determination of demeanor and credibility that are peculiarly within a trial judge’s province.” [Wainwright v.] Witt, 469 U.S. [412,] 429, 105 S.Ct. [844,] 855, 83 L.Ed.2d 841 [ (1985) ]. That finding must, be accorded proper deference on appeal. Id,- “A trial court’s rulings on challenges for cause based on, bias [are] entitled to great weight and will not be disturbed on appeal unless clearly shown to be an abuse of discretion.” Nobis v. State, 401 So.2d 191, 198 (Ala.Cr.App.), cert. denied, Ex parte Nobis, 401 So.2d 204 (Ala.1981).’ ” ’
“Dallas v. State, 711 So.2d 1101, 1107 (Ala.Crim.App.1997) (quoting Martin v. State, 548 So.2d 488, 490-91. (Ala.Crim. *832 App.1988)).. . ‘.“[Jjurors -who give responses that would support a challenge for cause may be rehabilitated by subsequent questioning by the prosecutor or the Court.” ’ Sharifi v. State, 993 So.2d 907, 926 (Ala.Crim.App.2008) (quoting Johnson v. State, 820 So.2d 842, 855 (Ala.Crim.App.2000)).
“‘“[TJhe test ' for determining whether a strike rises to the level of á challenge for cause is ‘whether a juror can set aside their opinions and try the case fairly and impartially, according to the law and the evidence.’ Marshall v. State, 598 So.2d 14, 16 (Ala.Cr.App.1991). ‘Broad discretion is vested with the trial court in determining whether or not to sustain challenges for cause.’ Ex parte Nettles, 435 So.2d 151, 153 (Ala.1983). ‘The decision of the trial court “on such questions is entitled to great weight and will not be interfered with unless clearly erroneous, equivalent to an abuse of discretion.” ’ Nettles, 435 So.2d at 153.” ’ ”
Albarran v. State, 96 So.3d 131, 158-59 (Ala.Crim.App.2011) (quoting Sneed v. State, 1 So.3d 104, 136 (Ala.Crim.App.2007), quoting in turn Dunning v. State, 659 So.2d 995, 996 (Ala.Crim.App.1994)).
A.
Kirksey asserts that, because of a pro-law-enforcement and State-witness bias and because he believed that “courts go too far in protecting the rights of the accused” (R. 1003), potential juror B.N. should have been struck for cause.
The relevant portion of the individual voir dire of potential juror B.N. is as follows:
“[DEFENSE COUNSEL]: [B.N.], we’d asked you to fill out a questionnaire that you filled .it out. It’s my understanding that some of your good friends work for the sheriffs department. And in response to some of the questions concerning if you’d give greater weight to somebody that worked in law enforcement when they testify, you indicated that you would. Do you feel — is that still accurate?
“PROSPECTIVE JUROR [B.N.]: (Witness nods head affirmatively.)
“[DEFENSE COUNSEL]: Do you feel like if a police officer testified that you would tend to believe the police officer over an average citizen?
“PROSPECTIVE JUROR [B.N.]: (Witness nods head affirmatively.)
“[DEFENSE COUNSEL]: And if the State calls a witness that you think that witness would be telling the truth more than you would if the defense called a witness?
“PROSPECTIVE JUROR [B.N.[8]]: Yes, sir.
[[Image here]]
“[DEFENSE COUNSEL]: So you’re not definitive on that. That’s fine.
“On Number 49: ‘Do you believe the courts go too far in protecting the rights of the accused?’ You wrote in ‘if they’re accused, they, should have no rights’.
“Do you feel that way?
“PROSPECTIVE JUROR [B.N.]: (Witness nods head affirmatively.) If they’re accused of it, yeah.
“[DEFENSE COUNSEL]: You understand they haven’t been convicted yet, they’re just accused of it?
“PROSPECTIVE JUROR [B.N.]: Yeah.
“[DEFENSE COUNSEL]: But you also put the fact' if the defendant is *833 charged, you feel he’s more likely to be guilty because he’s been accused of it?
“PROSPECTIVE JUROR [B.N.]: I just feel like, I mean, there’s something to lead them to that person to arrest him.
“[DEFENSE COUNSEL]: I understand.
“So if they’ve been arrested,. fhen they’re more than likely guilty and they should have no rights.
“PROSPECTIVE JUROR [B.N.]: Somewhat, yeah.
“[DEFENSE COUNSEL]: Do you think that that might affect your ability to be fair to both sides?
“PROSPECTIVE JUROR [B.N.]: I think I’d be fair, but, I mean, it would be difficult for me to, like, if a police officer was testifying or something like that, I would lean towards them more'than I would the defense, I guess;
“[DEFENSE COUNSEL]: That’s what I was asking, [B.N.]. Thank you, sir.
“[PROSECUTOR 2]:' [B.N.], if you were chosen as a juror in the case and the'judge explains to yoii that about the presumption- of innocence that I talked about during jury selections, can you follow the judge’s instructions?
“PROSPECTIVE JUROR [B.N.]: I believe so.
“[PROSECUTOR 2]: And do you always believe a police officer?
“[B.N.]: Not always, but—
“[PROSECUTOR 2]: So would there be circumstances then where that riiight not be the case? '
“PROSPECTIVE JUROR [B.N.]: Yes, sometimes.
“[PROSECUTOR 2]: Do you feel like you could fairly listen to all of the witnesses in the case and make your decision based just on the evidence and not on which witnesses said what but what you believe the the truth to be from the overall picture?
“PROSPECTIVE JUROR [B.N.]: Yes.
[[Image here]]
“[PROSECUTOR 1]: Would'you follow the law if you were selected as a juror and require us to prove to you beyond a reasonable doubt, no matter what'you think about law enforcement officers and everything else? Can you put all that aside and make a decision just based on the evidence?
“PROSPECTIVE JUROR [B.N.]: Yes, sir.
“[PROSECUTOR 1]: Ókay. That’s all I have.
“[DEFENSE COUNSEL]: That’s all.
[[Image here]]
“THE COURT; Let me ask about credibility -and weight to be given witnesses, since you mentioned you believe you would give mo.re weight to a law enforcement officer.'
“If you had — if the instructions given to you by the Court-were different from your beliefs in regards to the way you’re to weigh credibility, determine credibility and weight that you’re supposed to give testimony of different witnesses, if it were different from your personal beliefs, could you set aside your personal beliefs and apply the Court’s instructions to you on -credibility and weight to be given testimony?
“PROSPECTIVE JUROR [B.N.]: I think I could.
“THE COURT: Do you believe that your beliefs would substantially impair your ability to apply the Court’s instructions—
“PROSPECTIVE JUROR [B.N.]: No.
“THE COURT: — in your deliberations?
*834 “[B.N.]: No.
[[Image here]]
“THE COURT: Do you believe your personal beliefs would substantially impair your ability to be able to do that? And that’s in regards to any issue,, burden of proof, credibility, circumstantial evidence, anything of we’ve talked about today, you could put aside your personal beliefs and apply the Court’s definition and instruction?
“PROSPECTIVE JUROR [B.N.]: (Witness nods head affirmatively.)
“THE COURT: And your deliberation and consideration of these matters?
“PROSPECTIVE JUROR [B.N.]: (Witness nods head affirmatively.)
“THE COURT: Do you have any doubt or concern that you would be able to do — not be able to do that.
“PROSPECTIVE JUROR [B.N.]: (Witness shakes head negatiyely.)”
(R. 1001-13.)
“[E]ven though a prospective juror admits to a potential bias, if further voir dire examination reveals that the. juror in question can and will base his decision on the evidence alone, then a trial judge’s refusal to grant a motion to strike for cause is not error.” Perryman v. State, 558 So.2d 972, 977 (Ala.Crim.App.1989). Although potential juror B.N. originally made statements that might- have supported a challenge for cause, he later, after additional questioning,. indicated he would be able to set aside his personal beliefs as to any issue and apply the trial court’s instructions. Because B.N. had been sufficiently rehabilitated, the trial court’s decision to deny Kirksey’s challenge of B.N. for cause was not clearly erroneous.
B.
Kirksey contends that potential juror B.B. should have been struck for cause. He asserts that her removal was warranted because she felt that she might be too emotional, due to concerns about her ability to concentrate, and due to Concerns about whether she could be fair and impartial. The following occurred during individual voir dire of potential juror B.B.:
“[PROSECUTOR 2]: [B.B.], you indicated that based upon the facts and all of this ease, you’d find it very difficult or 'that you didn’t feel you could serve as a juror on the case.
“Can you just tell us a little bit more about that, please, ma’am?
“PROSPECTIVE JUROR [B.B.]: Well, you weré asking about the seeing tile evidence. I' tend to be very emotional and I really don’t know how I would react by having to look at things that might not be very appealing.
’“[PROSECUTOR 2]: Sure. Do you think that your tendency to be emotional and knowing that you’re probably going to see some pretty gruesome and difficult things during the course of the trial, would that make it — would you be able to be fair and impartial if that occurred?
“PROSPECTIVE JUROR [B.B.]: I would say I could be. But, you know, I mean, I would like to say yes, that I could be impartial, yes.
“But I don’t know how I would react if I saw things that were, you know. And I’m not trying to be difficult or anything like that.
“[PROSECUTOR 2]: No, I totally understand. In fact, we really appreciate the fact that you’re willing to tell us that, because that’s what’s so important about this part of the trial is so that we can understand how you guys feel. So I very much appreciate that.
“Do you have any?,.
“[PROSECUTOR 1]: Yeah. Let me just ask you this: Of course,, you understand that, you know, nobody, is asking you to-be an unfeeling robot?
*835 “PROSPECTIVE JUROR [B.B.]: Right.
“[PROSECUTOR 1]: We all have feelings and we’ve tried several of these. And it’s not unusual to have jurors crying during some evidence.
“But the main thing is are your emotions or your concern about your emotions such that you feel that it would overwhelm your ability to hear and consider the'evidence and render a verdict, a fair verdict in this case?
“And that’s what we really get to the nub of. Do you think you could be fair, even though there are emotional times in every trial?
“PROSPECTIVE ' JUROR [B.B.]: Right. I would like to say yes; that I could be fair, yes. And I. don’t want to sound like I’m trying to evade.the question., It’s just that I know when I get emotional, I don’t like to be emotional in front of other people. Like I’m—
“[PROSECUTOR i]: I’m sorry. I’m not trying to make you emotional.
“PROSPECTIVE JUROR [B.B.]: I know. And I’m so sorry that I get like this. And so I have a tendency, because I’m trying not to be emotional, that then sometimes I don’t pay attention because, you know, it gets — you know, because I have to collect myself. Does that make sense?
“[PROSECUTOR-1]: Yes.
[[Image here]]
“[PROSECUTOR 1]: Well, let me ask you this: .Do you understand that if there is any point during the trial that you or any other juror needs time or needs a break or, you know, whether it’s just to use the bathroom or anything else, you understand you could ask the Court for a—
“PROSPECTIVE JUROR [B.B.]: Right, yes.
“[PROSECUTOR 1]: And-that being the case, do you feel like you could — if you feel like you needed to stop, the Court could allow you to stop do you think you would be able to serve under those circumstances?
“PROSPECTIVE JUROR [B.B.]: Yes.
“[PROSECUTOR 1]: And be fair and listen to the evidence?
“PROSPECTIVE JUROR [B.B.]: Yes
'“[PROSECUTOR 1]: That’s all I have. '
“THE COURT: Questions from the defense?
“[DEFENSE COUNSEL 1]: I mean, a case like this may have pictures. And seeing. pictures like that and knowing that our client is the one who’s allegedly the perpetrator in the case, would your emotions get the best of you to where you would automatically think poorly of him?
“PROSPECTIVE JUROR [B.B.]: I would say no. I meau, you know, because I realize that, you know, it’s got to be. proven that he is the guilty party and that I also know that, you know, the fact that he was arrested, you know, makes him — you know, obviously there was a reason for his arrest.
“But as far as what you’re asking me, no, I don’t — and I know I’m probably saying more than I should.
“[DEFENSE COUNSEL 1]: We want you to say as much as you can. I mean, this is a decision to make. So we appreciate it.
“PROSPECTIVE JUROR [B.B.]: No, I hope that I can separate the fact that, you know,, how I’m feeling emotionally and..what’s being presented to me. I can keep, you know, keep that.separated.
“And I’m being really honest. I would like to' say- that definitely I could *836 do that, but, you know, I don’t think I could ever answer that question regardless if something as important as this or had something to do with a minor issue, you know.
“I mean, I definitely would hope that I could separate them. Does that answer your question? I’m sorry.
“[DEFENSE COUNSEL 1]: I think so.
“[DEFENSE COUNSEL 2]: [B.B.], I understand what you’re trying to say, but I think it’s important that you assert one way or the other.
“PROSPECTIVE JUROR [B.B.]: Right.
“[DEFENSE COUNSEL 2]: The question is whether you could separate emotion from fact. And you stated in your question that the fact that he was arrested — I believe the question is that he more likely to be guilty.
“PROSPECTIVE JUROR [B.B.]: No, I don’t mean that I feel like he’s more likely to be guilty. I feel like that there was a reason that he was the one arrested, as opposed to someone else arrested for this.
“But — so I realize that they’re going to have to prove that he is guilty of this crime. And my emotions, if that’s — I’m sorry, y’all.
“[PROSECUTOR 1]: You’re doing fine.
“THE COURT: Take your time.
“PROSPECTIVE JUROR [B.B.]: I will say that with all honesty I will try to separate the fact that by seeing something on a piece of paper or some type of evidence is not going to influence me as-to whether he’s guilty or not guilty.
“It’s — the whole picture is what’s going to make me determine whether he’s guilty or not. So — but—because I realize that not all evidence is going to make me be emotional. It’s just going to be the parts of the pictures and stuff like that that’s going to make me emotional.
“So does that answer — I feel like I’m going into too much detail.' I have a tendency to do that. But I want to make sure that you’re clear on the fact that I don’t have a problem with the rest of the evidence. It’s just seeing a child that’s been—
“[DEFENSE COUNSEL 2]: I understand what you’re trying to say, ma’am, but that’s the — the question is: Can you say that you’ll be fair after you’ve seen that?
“At this time, can you say — I know you’re saying ‘I’ll try to be,’ but—
“PROSPECTIVE JUROR [B.B.]: Then I guess if you’re really pinpointing me down, I guess I’m going to say I don’t know for surd that L could be.
“And so I guess the answer would be — I mean, is there a yes or no to that? I mean, I don’t know. Maybe — I mean, I guess that’s what you’re asking me, a yes or no question?
“[DEFENSE, COUNSEL 2]: Yes, ma’am., ,
“PROSPECTIVE JUROR [B.B.]: And I will say yes, that I could be — I could separate, you know, the emotion from — yes, that I could render a fair verdict or whatever.
“[DEFENSE COUNSEL 2]: Thank you, ma’am.
“[PROSECUTOR 2]: [B.B.], just because you. see a picture that makes you upset is not going to make you assume that this man is the one who did it; is that right?
“PROSPECTIVE JUROR [B.B.]: Right, yeah.
“[PROSECUTOR 2]: And you could be fair about making a determination as to who committed the<crime, right?
*837 “PROSPECTIVE JUROR [R.B.]: Yes.”
(R. 567-76.)
Like potential juror B.N., B.B. originally made statements that might have supported a challenge for cause. Later, after additional questioning, she .indicated that she could separate her emotions from the evidence and could render a fair verdict. Because B.B. had been sufficiently rehabilitated, the trial court’s decision denying Kirksey’s challenge of B.B. for cause was not clearly erroneous.
V.
Kirksey contends, in the first issue in his brief, that during jury selection the State discriminated against. African-Americans in violation of Batson v. Kentucky, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986).
Kirksey is an African-American, There were 14 African-Americans on the venire. Five African-American veniremembers were removed from the venire for cause, leaving nine African-Americans on the ve-nire. The State used 8 of its 37 peremptory strikes to remove African-Americans from the venire. One African-American and 11 Caucasians served on the jury.
Following jury selection, Kirksey challenged the State’s peremptory strikes under Batson. The trial court found that the defense had established a prima facie case of discrimination and required the State’s explanations 'for its peremptory strikes against three African-American venire-members — Es.D., B.R., and D.P.
A.
Kirksey contends that the trial court érred when it did not require’ the State to provide a race-neutral explanation for its peremptory strikes against African-American veniremembers R.K., V.L., E.M., R.P., and J.H.
. Kirksey asserts that, once the trial court found prima facie discrimination regarding Es.D., B.R., and D.P. and requested the State’s reasons for those strikes, the trial court erred to reversal when it did not require the State to provide a race-neutral explanation for all of its peremptory strikes against African-American venire-members, including R.K., V.L., E.M., R.P., and J.H. Kirksey asserts on appeal, as he did at trial, that “[ojnce such a case [of discrimination] is established, it is improper for a trial court to require the government to offer reasons for some strikes, but presume that the prosecutor had race-neutral reasons for others.” (Kirksey’s brief, P-14.)
This Court knows of no law requiring the State to provide race-neutral reasons for peremptory strikes other than those for which the defense has established pri-ma facie discrimination. The caselaw cited by the defense, Miller-El v. Dretke, 545 U.S. 231, 239, 125 S.Ct. 2317, 162 L.Ed.2d 196 (2005), does not stand for the proposition asserted by Kirksey. That case quotes Batson v. Kentucky, 476 U.S. 79, 98 n. 20, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), for the proposition that, when prima facie discrimination is established for a challenge, the “ ‘prosecutor must give a clear and reasonably specific explanation of his legitimate reasons for exercising the chal-leng[e].’ ” Miller-El v. Dretke, 545 U.S. at 239. Nevertheless, the record discloses that the prosecutor presented a reason for each peremptory strike used against African-Americans.
“Because the prosecutor stated his reasons for the questioned strikes, the issue whether [the defense] established ■á prima facie case of discriminatory use of peremptory challenges is moot. E.g., Hart v. State, 612 So.2d 520, 524 (Ala.Cr.App.), aff'd, 612 So.2d 536 (Ala.1992), cert. denied, 508 U-S. 953, 113 S.Ct. 2450, 124 L.Ed.2d 666 (1993). If a par *838 ty’s explanations fór its peremptory-challenges are -a 'part of the record, those explanations will be reviewed by the appellate courts regardless of the manher in which they came to be in the-record. E.g., Huntley v. State, 627 So.2d 1013, 1016 (Ala.1992); McLeod v. State, 581 So.2d 1144 (Ala.Cr.App.1990);”
Hall v. State, 816 So.2d 80, 82 (Ala.Crim.App.1999).
In addition to the explanations set forth for striking Es.D., B.R., and D.P., the veniremembers as to whom the trial court found prima facie discrimination, the State volunteered that it had - struck African-American veniremembers R.K., V.L., E.M., R.P., and J.H., because they had expressed reservations about imposing the death penalty. That a veniremember has reservations about imposing the death penalty is a race-neutral reason supporting a peremptory strike. -
“The peremptory strike of a prospective .juror who. had expressed reservations about the death penalty was sufficiently race-neutral so as to not violate Batson [v. Kentucky, 476 U.S. 79 (1986) ]. Hall v. State, [820 So.2d 113 (Ala.Crim.App.1999)]. Mixed feelings or reservations regarding imposition of the death penalty are valid race-neutral reasons for peremptory strikes and do not violate Batson. Smith v. State, 531 So.2d 1245 (Ala.Crim.App.1987).”
Acklin v. State, 790 So.2d 975, 988. (Ala.Crim.App.2000),
The trial court’s ruling on a Batson motion will be reversed only if it is clearly erroneous. Lynn v. State, 543 So.2d 709 (Ala.1988). Here, because the State did proffer a race-neutral -reason for. its .peremptory strikes against African-American veniremembers R.K., V.L., E.M., R.P., and J.H., the trial court’s denial of the Batson claim as to those veniremembers was not clearly erroneous,
B.
Kirksey contends that the State’s reasons given for its peremptory strike of African-American veniremember Es.D, were pretextual and-that the strike was an exercise in disparate treatment between black and white, veniremembers.[9] The State asserted at trial that it struck Es.D. because,
“[wjhat we are talking about with respect to Ms. [Es.D.] is pain that she suffers when she’s in a stressful situation and ih a crowd. And I felt like that was an issue. However, that’s not the only issue, because I have real questions about how well she could comprehend.
' “This was right after we had questioned Mr. [G.H.], Number 92, who clearly did not comprehend a lot of the questions. -
“Ms. [Es.D.] seemed confused during the questioning. She left a lot of blanks on her questionnaire that she did not complete. And because of all three of those things, that’s why she was stricken.”
(R. 1247-1248.)
The trial court ruled
“that the State has expressed — articulated meaningful race neutral reasons for the strikes when asked to give explanations by the Court, and, therefore, the Batson challenge of the defense is denied.
“That would go in regards to the three reasons that were articulated and *839 the Court’s position that the explanation on the balance of the individuals referenced by the counsel was not — did not rise to the level of establishment of a prima facie case.” : •
(R. 1248-1249.)
Kirksey asserts, as he did at trial, that the State’s reasons for striking Es.D. were a pretext for racial discrimination. As proof of this claim, Kirksey asserts that the State did not strike white venire-member T.P., who, like Es.D., had health concerns, and that the State did not strike white veniremembers K.G. and J.W., who, like Es.D., did not answer all the questions on the questionnaire.
1.
Kirksey argues that white venire-member T.P. was similarly situated with black veniremember Es.D. in regard to bad health and that the State’s failure to strike T.P. demonstrates that the strike against Es.D. based on EsJD.’s poor health was a pretext for discrimination. During individual voir dire, Es.D. indicated that she had in the past undergone open-heart surgery and that as a result, when she became exhausted, or became hot, or was in a crowd of people, her pacemaker “kicks off and [she has] real bad chést pains.” (R. 1146.)[10] She' further stated that her blood count had recently become so high that her doctor had increased her blood thinner because of concerns over her having a heart attack or a blood clot. When asked whether her health concerns would be a problem for her, Es.D. first said that “[i]n some ways it would,” and then she said that sometimes her pacemaker “kicks off and scares me and shocks me because my heart rate will be drop. And then they have to give me a shot to kick it back up:” (R. 1147.) When pressed about whether she would be thinking about getting sick and not about what would be going on in the courtroom, Es.D. stated: “No, not if . [I am] on the jury, then I’ll'try not to think about, you kiiow, my health and think about, you know, what I’m doing or what I’m being elected for, you know, yeah.”, (R. 1148.)
T.P. stated in regare} to his health that he had a leg ailment and that “it gets kind of uncomfortable if I sit for awhile.” (R. 960.) T.P. told the judge that his leg problem probably would not prevent him from serving as a juror if he were given breaks every hour to -an hour and a. half. T.P. further informed:the court that “some of [his] medication [made him] kind of sleepy when [he] got still and there’s not a lot going on. But other than that, somebody may have to punch [him] every once ip- a while and wake [him] up.” (R. 961-62.)
The State’s use of a peremptory strike .against Es.D. but not against T.P. did not evidence disparate treatment because Es.D. and T.P. did not have similar health concerns. Serving on the jury would have exposed Es.D, to conditions, i.e., being in a crowd, becoming exhausted, or becoming hot, that she stated could cause the activation of her pacemaker, which in turn would cause her to suffer chest pains. Additionally, her doctor had recently increased her blood thinners ‘because of concerns that she might have a heart attack or a blood clot. T.P. had a leg ailment that was alleviated if he was allowed to stand up every hour or hour *840 and a half and he took medication that made him-drowsy when “there’s not a lot going on.” (R. 962.) If T.P.’s health issues began to manifest themselves, the trial court could accommodate his. needs to alleviate the issues and the trial could continue. However, no action' by the trial court would alleviate a manifestation of Es.D.’s health issue. A manifestation of her symptoms would likely require her removal from the jury. Thus, Es.D. and T.P, where not similarly situated regarding their health concerns.
2.
Kirksey’s- allegation that the State’s claim that one reason it struck Es.D. was her failure to answer all the '■ questions contained in the juror questionnaire was a pretext for racial- discrimination is now moot. “It is well settled that ‘[a]s long as one reason given by the prosecutor for the strike of a potential juror is sufficiently race-neutral, a determination concerning any other reason given need not be made.’” Martin v. State, 62 So.3d 1050, 1059 (Ala.Crim.App.2010) (quoting Johnson v. State, 648 So.2d 629, 632 (Ala.Crim.App.1994)). A concern over a potential juror’s health problems is race neutral. Bang v. State, 620 So.2d 106, 107 (Ala.Crim.App.1993). Therefore, having found that concerns over Es.D.’s poor health was a race-neutral reason justifying the State’s exercise of a peremptory strike against Es.D., “no determination concerning any other reason given by the prosecutor needs to be made.” Hosch v. State, 155 So.3d 1048, 1071 (Ala.Crim.App.2013).
The trial court’s denial of this Batson claim was not clearly erroneous.
C.
Kirksey contends that the trial court erred in “fail[ing] to examine the prosecutor’s proffered reasons for striking [African-American veniremembers D.P. and B.R.] in light of the fact that the State also targeted and disparately questioned other African-Americans during voir dire.” (Kirksey’s brief, p. 27.) In his attempt-to show that the State engaged in discriminatory disparate treatment of D.P. and B.R., Kirksey presents on appeal the following examples of what he alleges demonstrates the State’s alleged dispárate treatment of “other” black veniremembers — i.e., R.K., J.H., and V.L. — from the treatment of white veniremembers in the jury-selection process.
“For example, prospective juror- [R.K.], a black female, expressed reservations about the death penalty but indicated during individual voir dire that there were situations in which she would consider death an appropriate punishment. (R. 796-97.) The State responded by challenging this assertion repeatedly in an effort to elicit a response from [R.K.] that would render her ineligible to serve. (R. 797-803.) It then unsuccessfully moved to strike [R.K.] for cause before exercising a peremptory strike against her. In contrast, the State made no effort to aggressively question or pursue for-cause challenges against white veniremembers [M.M.], [B.P.], [H.S.], [D.W.], [E1.D.], [D.F.], or [C.H.], who, like [R.K.], indicated they were personally opposed to the death penalty....
“The State also sought to call African American venire member [J.H.] back for further voir dire because he was opposed to capital punishment.... When defense counsel successfully argued that [J.H.] should not be questioned further because he indicated that he could fairly consider death despite his personal feelings, the State searched for other potential bases to exclude [J.H.] and claimed it wanted to inquire further about his wife’s medical condition. (R. 776-77.) After the State was unsuccessful in its search for a basis to challenge [J.H.] for cause, it used its third peremptory *841 strike to remove him. • (R. 777-79; Supp. C. 43.) In contrast, white venire-member [C.J.] also indicated that he had medical issues, but the State did not follow up with him. (R. 409-10, 780.)
“The State also searched for reasons to interrogate black juror [V.L.]. When the trial court rejected the State’s efforts to question her further about her views on the death penalty, the prosecutor then claimed that it wanted to ask [V.L.] about an answer in her questionnaire in which ‘she indicated something about she’d have to consider all of the evidence before concluding about somebody’s [fate].’ (R. 775-76.) The court concluded this was not a sufficient basis to warrant further voir dire, and the State proceeded to peremptorily strike [V.L.]. (Supp. C. 43; R. 776.) The State’s treatment of these black venire-members further supports a finding that it targeted and struck '[D.P.] and [B.R.] because of race. Miller-El [v. Dretkel], 545 U.S. [231] at 239 [ (2005) ].”
(Kirksey’s brief, pp. 27-29, footnote omitted.)
In this case the venire was separated into four panels. R.K., J.H., and V.L. were on panel 2. The veniremembers on each panel were first collectively questioned by the trial court. Among the questions asked of the veniremembers ori panel 2 was: “Do you support the imposition of the death penalty?” (R. 650.) Numerous veniremembers raised their hand as an affirmative gesture in 'answer to the question. Included in that number was veniremember C.J. The trial court then asked those veniremembers: “If you are selected as a juror in- this case, will you, nevertheless, be able to follow my instructions as a judge and fairly consider’ the imposition of the sentence of life imprisonment without the possibility of parole, if appropriate in this case? And your answer must be yes or no.” ■ (R. 650-51.) All the veniremembers who had previously indicated that they supported the death penalty indicated that-they would follow the trial court’s instructions and be fair. The trial court then asked: “Are you religiously, morally or otherwise against the imposition of the death penalty?” (R. 652-53.) Numerous veniremembers raised their hand as an affirmative gesture in answer to the question. Included in that number were veniremembers R.K., V.L., and J.H. The trial court then asked those venire-members: “Even though you have a conscientious, religious or other objection to the death penalty, if you are selected as a juror in this case, will you, nevertheless, follow my instructions as judge and fairly consider the imposition of death, if appropriate in this ease? And your, answer must be yes. or no.” (R, 653.) After additional questioning , by the trial court, the trial court turned “the matter over to the attorneys for questions.” (R. 655.)
When the State questioned panel 2 collectively, the . following took place: venire-member J.H. stated that 15 to 25 years ago he lived ■ in the apartment complex where the murder took place; venire-member R.K. stated that, as an employee in the after-school program at Donahoo Elementary School, ■ she was required by law to report suspected child abuse; and veniremember R.E. affirmatively indicated that she had a “heartfelt” conviction preventing her from imposing the death penalty’in any case. (R. 685.)
When defense counsel questioned panel 2 collectively, the following took place: veniremembers R.K. and V.L. each indicated, that he or she believed that it was improper to discuss the possibility of punishment before determining guilt, and each indicated that his or her beliefs would not prevent him or her from fairly determining the case.
When both the State and defense counsel had concluded with their questions to *842 the panel, the trial court asked the parties who they wished to question individually. The State proffered a list that included J.H., R.K., and V.L. Defense counsel then expressed to the trial court that the State had indicated that it intended to ask follow-up questions to each veniremember who had affirmatively indicated that he or she could be fair even though he or she was against the death penalty. Defense counsel asserted that this was contrary to the State’s own assertion that the parties had to take the veniremembers “for their word.” (R. 714.) Defense counsel argued that allowing the State to call each member of the panel for individual questioning was just providing the State with an opportunity “to berate [the veniremembers] into saying something where they could be struck for cause, then I’m going to have to call each person individually that said they supported the death penalty and do the same thing.” (R. 714.) Therefore, defense counsel requested that the trial court require the State to “articulate [a] specific reason after someone: and why they could not be.taken for their own word.” (R. 715.)
The trial court requested a response from the State. The prosecutor stated that some veniremembers on panel 2 “specifically stated that they could not, under any circumstances,: impose the death penalty. If the. Court wants to hear the challenges for cause, we’ll go ahead and do that.” (R. 716.) The trial , court stated that it had follow-up questions for the veniremembers who said they could not impose the death penalty under any circumstances. Nevertheless, the trial court asked the State: “[Y]ou’re really not just asking them the same question over again'?”' (R. 716.) Defense counsel'interjected' that, specifically, veniremember V.L. had said that she could be fair and she should be taken at her word instead of being brought in and questioned individually. The prosecutor stated that he had some questions for V.L. because she had indicated that she would consider the death penalty, and because a question from her juror questionnaire required follow-up. The prosecutor stated: “I don’t think there’s anybody on our list we only wanted to bring back just under the death penalty who were — you know, basically answered they could be- fair.... There wasn’t anybody who said they were opposed to [the death penalty], but they could fairly consider it that were having to come back on that issue.” (R. 717.) The trial court then called the names of venire-members who needed to stay for further questioning. Among those veniremembers were J.H., R.K., and V.L.
Before calling J.H., the.prosecutor stated: “I was just going to ask him one follow-up question, just simply whether, or not based on his feelings on the death penalty if he feels under any set of circumstances impose the death penalty, if he’s selected to serve on this jury, just basically can he do it is what I want to know.” (R. 774.) Defense counsel responded that J.H. had said he could be fair and that the Státe should not be allowed to berate him and change his mind by presenting him with endless scenarios. The prosecutor stated that J.H. had stated that he “could consider [the death penalty]. He never said he could impose it.” (R. 775.) Defense counsel stated that V.L. was another veniremember on the State’s list who had stated that she could be fair and, thus, should not be questioned further. The prosecutor stated , ¡that he .had another question about V.L, because she had answered on the, questionnaire “something about she’d have to .consider all, of the evidence. before concluding about somebody’s [fate].” (R. -775-76.), The trial court ruled, that because J.H. had earlier expressed concerns about attending court due to a medical condition affecting his wife, the State could ask follow-up ques *843 tions to • J.H. on that topic. The State questioned J.H. individually about his wife’s condition. J.H. stated that his wife had been released from the care of her doctor, and, thus, his need to be available to drive for her was no , longer a matter potentially interfering with his ability, to serve as a juror. Defense counsel had no questions for J.H. but, instead, asserted to the trial court that the State had not sought to individually question white veniremember C.J., who, like J.H., had stated that he had medical problems. The State responded that it had initially wanted to question J.H. about the death penalty but that the court’s sustaining defense counsel’s objection had prevented that. The State further stated that, regardless, it did not need to ask follow-up questions of C.J. regarding his medical problem, because, unlike J.H., C.J. did not state that he had a problem attending court but, rather, stated only that he needed frequent bathroom breaks.
Defense counsel agreed that “[R.K.] . [does] have some areas'that require follow up.” (R. 787.)- Regarding several venire-members, including''R.K.’, the trial court stated: ■ •
“I believe it would merit the additional follow-up question that -is provided by the standard question format. I think-it would be incumbent on the'Court to ask if they are under no circumstances that they would fairly consider-the imposition of death. So I’m just going to bring them in. I’m going to ask that question.” ...
(R. 788-89.)
R.K. then indicated in response to the trial court’s questioning that, despite her views on the death penalty, she could comply with her oath and follow ■ the trial court’s instructions and that there were circumstances in which she could consider imposing the death penalty. The trial court then allowed the defense to ask R.K. follow-up questions, in response to-which she stated that she “didn’t believe in taking a life” and that she could not “assure this Court that [she] could actually impose the death penalty in this case.” - (R. 798, 799.) In response to defense counsel’s follow-up questions, R.K. stated that she could follow the law and that maybe a cirQumstance in which she could impose the death penalty was if someone in her family was hurt. The State asked R.K. additional follow-up questions, eliciting the following response: “I just couldn’t [vote for the .death- penalty].” (R. 801.) The trial court then asked R.K. whether she could follow the - trial court’s instructions that included fairly considering the imposition of the death penalty, and she responded affirmatively. During discussions concerning whether R.K. should be struck for cause, the prosecutor expressed that he believed that defense counsel had implied that the State was “trying to hunt up some reason to get rid of black jurors.” (R. 807.) The prosecutor then stated that he was a- black man and that he was “not trying to find any reason to get rid of people.” (R. 807.) The prosecutor asserted that'it was R.K. who “stood up and said she couldn’t impose the death penálty [and] . -.. [he] was trying to get to the bottom of her feelings about the death penalty,” and, he said, “every time [R;K.] was asked ‘Could you vote to impose the death penalty,’- each and every time she said no.” (R. 807.) The trial court stated that “[s]he- did appear to be pretty sure that her convictions would -keep her from .imposing the death penalty” but that she also “assured [the trial court] that she would follow [the court’s] instructions and consider fairly the imposition, of the sentence of death ... if it came to that.” (R. 808.) Therefore, as to a challenge for cause regarding R.K., the trial court reasoned that the “safest course” was to deny a challenge for cause. (R. 809.)
*844 Regarding V.L., following a brief discussion, the trial court and counsel determined that V.L. had stated that she could consider the death penalty; thus, no follow-up questions were needed.
The prosecutor thoroughly questioned the veniremembers collectively and then, if necessary, questioned certain venire-members individually. The record further discloses that the State exercised 20 peremptory strikes to remove veniremembers who had expressed reservations about the death penalty. Included-in those strikes were white veniremembers M.M., B.P., H.S., D.W., E1.D., D.F., and C.H., and black veniremembers D.P. and B.R., as well as the black veniremembers set forth in the examples from Kirksey’s brief— R.K., J.H., and V.L. Nothing in the record discloses that J.H., R.K., or V.L. received disparate treatment when compared to other veniremembers.
VI.
Despite acknowledging that “this Court has previously approved of victims’ relatives sitting with the State” (Kirksey’s brief, p. 91), Kirksey contends, in his 14th issue, that the trial court erroneously allowed Yolanda Norwood, the victim’s mother, to sit at counsel table during the course of the trial. (Kirksey’s brief, p.,91.)
Kirksey objected to Yolanda’s sitting at the counsel table during voir dire and trial. He received an adverse ruling from the court. We review this claim of error for abuse of discretion. See, e.g., McGowan v. State, 990 So.2d 981 (Ala.Crim.App.2003).
“Section 15-14-53, Ala.Code 1975, gives a victim the right to be present in the courtroom and to sit at counsel table during the trial.” Hammers v. State, 661 So.2d 788, 788 (Ala.Crim.App.1994). Section 15-14-56(a), Ala.Code 1975, provides:
“Whenever a victim is unable to attend such trial or hearing or any portion' thereof by reason of death; disability; hardship; incapacity; physical, mental, or emotional condition; age, or other inability, the victim, the victim’s guardian-or the victim’s-family may select a representative who shall be entitled to exercise any right granted to the victim, pursuant to the provisions of this article.”
Based on the above, the trial court committed no error in allowing Yolanda to sit at, the prosecutor’s table. Thus, the trial court did not abuse its discretion.
Vii.
Kirksey, in his fourth issue, argues that the trial court erred by admitting State’s Exhibit 23, Cornell’s medical records from Children’s Hospital, because, he contends, those records included two documents that contained inadmissible hearsay and, thus, the admission of those documents violated the Confrontation Clause of, the Sixth Amendment to the United States Constitution. Those documents are “Progress Notes” written by Lynda Williams, a medical social worker, and an “Addendum to Pediatric Progress. Notes”. (“the addendum”), which was written by Dr. Nancy Tofil. ; .
Williams’s notes- were - apparently written while the medical staff was- trying to save Cornell’s life. ' After a notation regarding how Cornell was received' from Gadsden Regional Medical Center and indicating that he "was a “victim of ‘non accidental trauma’ per Dr. Tofíl” (C. 279). Williams’s notes indicate the steps that were being taken in response to the ongoing emergency. The -steps listed were: (1) the Alabama Department of Human Resources had- received a report and an investigation was underway; (2) the “alleged perpetrator” was incarcerated; (3) a safety plan was in place for Cornell’s siblings; (4) Cornell’s mother was allowed visitation; (5) the Children’s Hospital chaplain had *845 been informed of the situation and should be contacted if Cornell’s condition worsened; and (6) the 1593[11] was “to be forwarded to the Etowah County [Department of Human Resources] if needed.” (C. 279.)
The addendum is on a page labeled “Special Care Note Addendum.” In labeling the- document an “addendum,” Dr. To-fil indicated 'that it was intended to be a continuation of the “Pediatric Progress Notes” she had dictated regarding the steps taken in the attempt to save .Cornell’s life. In fact, both' of these documents have the .heading “Pediatric Progress Notes” and list the same patient name, medical-record number, room number, and billing number. The first page indicates that the dictation occurred- on April 16, 2006, at 12:05 p.m.,, while the dictation' time of the addendum was 12:47 p.m, on. April 16, 2006, only 42 minutes later. In the addendum, Dr. Tofil dictated:
“Please note, on my arrival here, the social worker was called in from home. She investigated and the police were called from Gadsden. They were actually already called from the emergency room due to the high suspicion for child abuse. When the patient died, the coroner was called and the autopsy will be done this week.
“Of note, also, the social worker was called and the other children were placed in protective custody to insure their .safety while his potential abuse case is worked up.”
(C. 281.)
Kirksey contends that Williams’s notes and the addendum contain inadmissible hearsay and that their admission violated the Confrontation Clause. He also asserts that he was prejudiced by their admission.
Because Kirksey did not object to the admission of State’s Exhibit 23, our review is limited to plain error. See Rule 45A, Ala. R.App. P.
A.
Kirksey argues that Williams’s notes and the addendum contained inadmissible hearsay and that their admission violated the Confrontation Clause of the Sixth Amendment.
1.
Hearsay is “a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted.” Rule 801(c)(1), Ala. R. Evid. Rule 802, Ala. R. Evid., providés that “[h]earsay is not admissible except as provided by these rules, or by other rules adopted by the Supreme Court of Alabama or by statute.” The Advisory Committee’s' Notes to' that hile explain that the “broad exclusion [of hearsay evidence] ... is subject to exceptions found in other Alabama Rules of Evidence....” One exception to the exclusion of hearsay evidence is found in Rule 803(6), Ala. R. Evid., commonly reférred to as the “business-records exception.” That rule provides:
“A memorandum, report, record, or data compilation, in any form, of acts, events, conditions, opinions, or diagnoses, made at or near the time by, or from information transmitted by, a person with knowledge, if kept in the course of a regularly conducted business activity, and if it was the regular practice of that business activity to make the memorandum, report, record, or data compilation, all as shown by the testimony of the custodian or other qualified witness, unless the source of information or the *846 method or circumstances' of preparation indicate lack of trustworthiness. The term ‘business’ .as used in this' paragraph includes business, institution, association, profession, occupation, and calling of every kind, whether or not conducted for profit.”
Section 12-21-5, Ala.Code.1975,.is similar to this rule and is specific to hospital records. Regarding this statute, Professor Gamble has explained:
“There is a specialized business records statute in Alabama which renders admissible certified copies of hospital records that are kept in the regular course of the particular hospital’s. business. Copies of these hospital records, when properly certified, may be introduced into evidence without the production of the original and without the custodian of these records being present to lay a predicate.”
Charles Gamble &. Robert J. Goodwin, McElroy’s Alabama Evidence. § 254.01(9) (6th ed.2009) (footnote omitted). State’s Exhibit 23 contains an authenticity certification complying with § 12-21-7, Ala.Code 1975, as required for a document to be admitted under § 12-21-5. Thus, the exhibit was admitted for "the truth of the matters contained in the documents but under an exception to the hearsay rule.
Section 12-21-5 “does not allow the carte blanche admission" of all hospital records .... ” Wyatt v. State, 405 So.2d 154, 157 (Ala.Crim.App.1981)(citing Lowery v. State, 55 Ala.App. 511, 317 So.2d 357 (1974), reversed on other grounds, 294 Ala. 347, 317 So.2d 360 (1975)).
In Liberty National Life Insurance Company v. Reid, 276 Ala. 25, 158 So.2d 667 (1963), the Alabama Supreme Court, after reviewing court decisions “[i]n other states where, as in Alabama, hospital records are admitted under a business records statute,” summarized those decisions as holding
“that since statements in hospital records pertaining to the manner of the injury are hearsay, "and have no reference to the diagnosis or treatment of the patient, they should not be considered as records pertaining,to the business of the hospital,, unless, pathologically germane to a diagnosis and, treatment of the patient.”
Liberty National, 276 Ala. at 36,158 So.2d at 677. In Holland v. State, 424 So.2d 1387 (Ala.Crim.App.1982), this Court noted that the State had “correctly cite[d] Liberty National ... for the rule that hearsay statements in hospital records pertaining to the manner of the injury were not admissible under .the Business Records’Act.” Holland, 424 So.2d at 1391. Further, in Burress v. Dupree, 287 Ala. 524, 253 So.2d 31 (1971), the Alabama Supreme Court relied on Liberty National in determining that the trial court had committed error when it denied a request to redact hospital records before their admission.
Because portions' of Williams’s notes and the addendum contained references to information not kept in the regular course of Children’s Hospital’s business, their admission was error.
2.
The Sixth Amendment to the United States Constitution,' made obligatory on thé states by the Fourteenth Amendment,[12] provides, in relevant part, that, “[i]n all criminal prosecutions, 'the accused shall enjoy the right ... to be confronted with.the witnesses against him.”
The United States Supreme Court has summarized its Confrontation Clause cases as instructing' that “[testimonial statements of witnesses absent from trial have *847 been admitted only where the declarant is unavailable, and only where the defendant has had a prior opportunity to cross-examine.” Crawford v. Washington, 541 U.S. 36, 59, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004)(footnote omitted). Also in Crawford, the Supreme Court recognized items “that by their nature [are] not testimonial — for example, business records_” Crawford, 541 U.S. at 56.
“The Confrontation Clause of the Sixth Amendment provides: ‘In all criminal prosecutions, the accused shall enjoy the right ..... to be confronted with the witnesses against him.’ In Crawford v. Washington, 541 U.S. 36, 53-54 (2004), we held that this provision bars ‘admission of testimonial statements of a witness who did not appear at trial unless he was unavailable to testify, and the defendant had had a prior opportunity for cross-examination.’ A critical portion of this holding, and the portion central to resolution of the two cases now before us, is the phrase ‘testimonial statements.’ Only statements of this sort cause the declarant to be a.‘witness’ within the meaning of the Confrontation Clause. See id., at 51. It is the testimonial character of the statement that separates it from other hearsay that, while subject to traditional limitations upon hearsay evidence, is not subject to the Confrontation Clause.”
Davis v. Washington, 547 U.S. 813, 821, 126 S.Ct. 2266, 165 L.Ed.2d 224 (2006).
The United States' Supreme Court has further instructed that “the [Confrontation] clause does not tolerate dispensing with confrontation simply because the court believes that questioning one witness about another’s testimonial statements provides a fair enough opportunity for cross-examination.” Bullcoming v. New Mexico, 564 U.S. 647, 662, 131 S.Ct. 2705, 2716, 180 L.Ed.2d 610 (2011).
Williams’s notes reference Cornell as being a “victim of non accidental trauma” and contain information regarding the investigation of his case and his family members, specifically mentioning that the “alleged perpetrator [has been] incarcerated.” (C. 279.) In the addendum, Dr. Tofil noted that the police had been called “due to the high suspicion for child abuse” and that Cornell’s siblings had been “placed in protective custody to insure their safety while [Cornell’s] potential abuse case is worked up.” (C. 281.)
Although “[b]usiness records" are not testimonial,” United States v. Naranjo, 634 F.3d 1198, 1213 (11th Cir.2011), we have concluded that neither Williams’s notes nor the addendum were business records of the Children’s Hospital. The nature of the information contained in the documents Was testimonial in nature, and their admission violated the Confrontation Clause.,
b:
Kirksey contends that he was prejudiced by the admission of Williams’s notes and the addendum. He argues that prejudice arose when the trial court found that the Children’s Hospital records established proof of the corpus delicti and when the prosecution argued that they were proof of intent. Kirksey further asserts that he was prejudiced by their admission because they “buttressed the testimony of the State’s pathologist, Dr. Adel Shaker.” (Kirksey’s brief, p. 58.). Most of the information in Williams’s notes- and the addendum, however, was cumulative to properly admitted evidence, and the portions that were cumulative did not prejudice Kirksey.
Both Yolanda and Det. Farris testified that Cornell was transported to Children’s Hospital by helicopter.' Det. Farris’s testimony established that the GPD had been involved in the case while Cornell was still *848 in the emergency room at Gadsden Regional Medical Center and that the Alabama Department of Human Resources had provided for the safety of Cornell’s siblings. She also testified that Kirksey had been arrested on the afternoon of Cornell’s death,
Dr. Shaker testified that he performed the autopsy of Cornell and that the cause of death was blunt-force trauma to the head. He also stated that Cornell’s internal injuries could have been caused by man standing on him and striking him. The “Report of Autopsy,” which was admitted as State’s Exhibit 46, established that the cause of death was blunt-force trauma to the head and that the manner of death was homicide.
The only matters mentioned in Williams’s notes that were not referenced in other exhibits or trial testimony are that Yolanda had been allowed visitation, that the Children’s Hospital chaplain had been apprised of Cornell’s situation and would be contacted if his condition worsened, and that the Form 1593 would be forwarded to the Etowah County Department of Human Resources if needed. Reference to those matters did not prejudice Kirksey. The only matters mentioned in the addendum that were not covered by other exhibits or testimony are that the social worker and the coroner had been called, and reference to those matters was not prejudicial to Kirksey.
C.
Having determined in Part III.A. that the admission of Williams’s notes and the addendum was error, we must now determine whether the error was harmless. ■
In Lewis v. State, 889 So.2d 623 (Ala.Crim.App.2003), we stated:
“ ‘The United States Supreme Court has recognized that most errors do not automatically render a trial unfair and, thus, can be harmless.’ Whitehead v. State, 777 So.2d 781, 847 (Ala.Crim.App.1999), aff'd, 777 So.2d 854 (Ala.2000), cert. denied, 532 U.S. 907, 121 S.Ct. 1233, 149 L.Ed.2d 142 (2001), citing Arizona v. Fulminante, 499 U.S. 279, 111 S.Ct. 1246, 113 L.Ed.2d 302 (1991).
‘“After finding error, an appellate court may still affirm a conviction or sentence on the ground that the error was harmless, if indeed it was. Chapman [v. California, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967) ]; Sattari v. State, 577 So.2d 535 (Ala.Crim.App.1990), cert. denied, 577 . So.2d 540 (Ala.1991); [Ala.] R.App. P. 45.. ¡. In order for a constitutional error to be deemed harmless under Chapman, the state must prove beyond a reasonable doubt that the error did not contribute to the verdict and/or sentence. In order for a -non-constitutional error to be deemed harmless, the appellate court must determine with “fair assurances ... that the judgment was not substantially swayed by the error.” Kotteakos v. United States, 328 U.S. 750, 765, 66 S.Ct. 1239, 1248, 90 L.Ed. 1557 (1946). See Brecht v. Abrahamson, 507 U.S. 619, 113 S.Ct. 1710, 123 L.Ed.2d 353 (1993); Vines v. United States, 28 F.3d 1123, 1130 (11th Cir.1994).... In order for the error to be deemed harmless under Ala. R.App. P. 45, the state must establish that the error did not or probably did not injuriously affect the appellant’s substantial rights.... The purpose of the harmless error rule .is to avoid setting aside a conviction or sentence for small errors or defects that have little, if any, likelihood of changing the result of the trial or sentencing.’
“Davis v. State, 718 So.2d 1148, 1164 (Ala.Crim.App.1995), aff'd, 718 So.2d 1166 (Ala.1998), cert. denied, 525 U.S. *849 1179, 119 S.Ct. 1117, 143 L.Ed.2d. 112 (1999).”
889.So.2d at 666.
Having concluded that most of the information in Williams’s notes and the addendum was cumulative to properly admitted evidence and that the information that was not cumulative did not prejudice Kirksey, we likewise conclude that the admission of those documents constituted harmless error because Kirksey’s substantial rights were not seriously- affected by the admission of those documents.
VIII.
Kirksey argues in his ninth issue that the trial court erred in allowing the State .to introduce inadmissible hearsay during Det. Farris’s testimony. He contends that there were three types of such error.
As we discussed in the previous section, “hearsay” is defined as “a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted.” Rule 801(c)(1), Ala. R. Evi'd. “A statement offered for a reason other'than to establish the'truth of the matter asserted therein is not hearsay.” Deardorff v. State, 6 So.3d 1205, 1216 (Ala.Crim.App.2004). We have explained:
“ ‘ “A statement may' be admissible where it is not offered to prove'the truth of whatever facts might be stated,- ‘but rather to establish the reason for action or conduct by the witness [when the reason for the action or conduct is relevant to an issue at trial].’ ” Edwards v. State, 502 So.2d 846, 849 (Ala.Cr.App.1986) (quoting Tucker v. State, 474 So.2d 131, 132 (Ala.Cr.App.1984), rev’d on other grounds, 474 So.2d 134 (1985)). The officers related information obtained from other sources to explain why they proceeded as they did. This was not hearsay. See, e.g., Brannon [v. State ], 549 So.2d [532] at 539 [ (Ala.Crim.App. 1989) ]; McCray v. State, 548 So.2d 573, 576 (Ala.Cr.App.1988). See, also, Molina v. State, 533 So.2d 701, 714 (Ala.Cr.App.1988), cert. denied, 489 U.S. 1086, 109 S.Ct. 1547, 103 L.Ed.2d 851 (1989); Tillis v. State, 469 So.2d 1367, 1370 (Ala.Cr.App.1985).’ ”
Spradley v. State, 128 So.3d 774, 785 (Ala.Crim.App.2011) (quoting Sawyer v. State, 598 So.2d 1035, 1038 (Ala.Crim.App.1992)).
In Smith v. State, 795 So.2d 788 (Ala.Crim.App.2000), a case upon which we relied in Deardorff, a. police officer testified as to what.the defendant’s mother had told him about clothes in a washing machine. We concluded:
“A review of the above-quoted portion of the record shows that this statement was elicited to establish the reasons for the officer’s action and the reasons the officers searched certain areas of the trailer. . It was not offered for the truth of the matter asserted and was not hearsay. ‘The fact of'the conversations in this case was offered' to explain the officer’s ' actions and presence at the scene — not for the truth of the matter asserted. Accordingly, it was not hearsay. Clark v. City of Montgomery, 497 So.2d 1140, 1142 (Ala.Cr.App.1986).’ Thomas v. State, 520 So.2d 223 (Ala.Cr.App.1987).
“Moreover, Smith told police in his statements that he had washed the clothes he had worn during the robbery-murder. Thus, even if this evidence was hearsay, it was cumulative of other evidence that -was presented though Smith’s own admissions to police.”
Smith v. State, 795 So.2d at 814. With those legal principles -in mind, we address Kirksey’s claims of error.
A.
Kirksey asserts that it was error to allow Det. Farris to testify about state *850 ments Yolanda made to her because the State used the statements to support its theory that Yolanda and her daughters were out of the-house when Cornell was injured. The first of those statements came when. Det. Farris was testifying about her first contact with Yolanda at the Gadsden Regional Medical Center on April 15. Det.' Farris stated that when she asked Yolanda “what’s going on here[?],” Yolanda replied, “I don’t know. I don’t know. I wasn’t there.” (R. 1432.) Kirk-sey also claims 'error in' Det. Farris’s relaying statements made- by Yolanda in which Yolanda specifically said that she and her daughters had walked to the store while Kirksey was with Cornell at the apartment. Because no. objections were made at the time these statements were admitted, these claims are reviewed for ■ plain error. See Rule 45A, Ala. R.App. R.
The context in which the statements about which Kirksey complains were made demonstrates that they were offered not to prove the truth of the matter asserted but, rather, to establish what motivated Det. Farris to do what she did.<in response to what she had learned from Yolanda. In each, statement, Yolanda asserted that she was not at the apartment when Cornell was fatally injured. The first statement Yolanda made to Det. Farris occurred at the hospital, shortly after Det. Farris became involved in the investigation and was attempting to obtain basic information. In the latter statement, Yolanda informed Det. Farris where she had been during her absence from the apartment. At trial, Det. Farris testified that, in response to that statement, “that’s why I went to the store to see if she was'indeed where she said she was.” (R. 1462.) Similarly, Kirk-sey also complains that Det. Farris testified “that' Ms. .Yolanda’s depiction of events was confirmed during a forensic interview of her eight-year-old daughter, [S.J.].” (Kirksey’s brief, p. 78.) At trial, however, Det.-Farris was asked not whether Yolanda’s version of events conformed with S.J.’s interview but, rather, whether the video surveillance at the store where Yolanda and her daughters went on the afternoon of- April 15, 2006, conformed with S.J.’s interview.
“This Court has long held that the erroneous admission of evidence that is merely cumulative is harmless error. Dawson v. State, 675 So.2d 897, 900 (Ala.Crim.App.1995), aff'd, 675 So.2d 905 (Ala.1996). Moreover,' ‘[tjestimony which may be apparently illegal upon admission may be rendered prejudicially innocuous by subsequent or prior lawful testimony to the same effect or from which the same facts can be inferred.’ Thompson v. State, 527 So.2d 777, 780 (Ala.Crim.App.1988):” ‘ ’
Surratt v. State, 143 So.3d 834, 840 (Ala.Crim.App.20l3).
Moreover, assuming that Det. Farris’s testimony regarding Yolanda’s whereabouts at the time Cornell was injured was hearsay, its. admission would have been harmless error because it was cumulative to other evidence presenting the same information. On April 16, 2006, Kirksey gave Det. Farris two -written statements. In each statement Kirksey clearly indicated. that Yolanda was not present when Cornell suffered his fatal injuries... In his second written statement, Kirksey wrote that Cornell had been injured before Yolanda returned from the store. Kirksey also testified that he did not dispute Yolanda’s testimony regarding “how that day in question, April 15th, 2006, how that went just from more or less waking up until later.” (R.1954.) ■ Yolanda had testified that she and her two daughters had gone to the store > and that shortly after she returned to her apartment, she. discovered blood on Cornell’s mouth. Thus, Det. Far-ris’s testimony regarding Yolanda’s whereabouts was cumulative to both Yolanda’s *851 and Kirksey’s testimony and to Kirksey’s written statements. Moreover, the objectionable testimony was not only cumulative to other similar evidence, it was not of particular importance to the prosecution of Kirksey because it concerned a fact not in dispute and it was a very small part of a prosecution that included Kirksey’s inconsistent statements, evidence as to his motive, and inculpable forensic evidence. See Featherston v. State, 849 So,2d 217, 222 (Ala.2002) (stating that, in determining whether constitutional' hearsay error, is harmless, the following four factors should be considered: 1) the importance of the declarant’s testimony to the prosecution’s case, 2) whether the testimony was cumulative, 3) the presence or absence of evidence corroborating or contradicting the testimony of the declarant on., material points, and 4) the overall strength of the prosecution’s case). Based on the above, Det. Farris’s testimony was not only cumulative to other similar evidence, but also any error in its admission was harmless.
B.
Kirksey also contends that it was error to allow Det. Farris to testify about certain statements regarding Cornell’s injuries made to her by'Dr. Shaker in a telephone call following the autopsy. Because no objection was made at the time these statements were admitted, this claim is reviewed for plain error. See Rule 45A, Ala. R.App. P.
Again, the testimony concerning these statements demonstrates that they were offered not to prove the truth of the matter asserted but to show the effect the statements had on Det. Farris’s investigation. Indeed, just after relaying what Dr. Shaker had told her in the conversation, Det. Farris was asked: “Based' on what you learned and what you had found out already from Mr. Kirksey, did you seek to obtain a warrant for Mr. Kirksey’s arrest?”- (R. 1501.) She replied: “I did.” (R. 1501.)
This was not, however, 'the only way in which Det. Farris used the information she had obtained from Di*. Shaker. She further testified that, in her final interview of Kirksey, she relayed what she had learned from Dr. Shaker to elicit additional information about Cornell’s death. Specifically, Det. Farris testified that, in that final interview, she told Kirksey that Cornell had suffered injuries in addition to .the previously disclosed head injury and that there were “massive injuries.” (R. 1510.) Det. Farris also testified that, based on Dr. Shaker’s having informed her that a lot of force would have been required to cause Cornell’s injuries, she asked Kirksey whether he had punched Cornell. (R. 1510-11.) By using what she had learned from Dr. Shaker, Det. Farris elicited new information from Kirksey. When Det. Farris told him about the additional injuries, Kirksey stated: “Well, I drank more beer than I told you I did.” (R. 1509.) When asked whether he had punched Cornell, Kirksey replied: “Oh no, no, no, no punching_ I kicked him.” (R. 1511.)
Because the statements Dr. Shaker madé to Det. Farris were not offered to prove the truth of the matter asserted but, rather, to show how the statements affected her investigation and how the use of the statements helped .secure additional statements from Kirksey, their admission was not erroneous.
Moreover, even if the admission of Det. Farris’s descriptive testimony regarding information she had obtained from Dr. Shaker about. Cornell’s injuries had constituted error, that error would have been harmless because the testimony was cumulative to other similar evidence, See Sur-ratt v. State, 143 So,3d .834, 840 (Ala.Crim. App.2013). Dr. Shaker testified at trial, with the aid of photographic exhibits, that *852 his examination of Cornell’s chest and abdomen disclosed numerous and severe blunt-force trauma to Cornell’s chest and abdomen, which he described for the jury. Dr. Shaker testified that had Cornell not died from his head injury, he would have died from his numerous internal injuries. Moreover, the allegedly objectionable testimony was not only cumulative to other similar evidence, it was not of particular importance to the prosecution of Kirksey because the extent of Cornell’s injuries and the fact that he died from those injuries was not in dispute. Moreover, the prosecution of Kirksey for inflicting those injuries included Kirksey’s inconsistent statements and his own assertion of his motive. See Featherston v. State, 849 So.2d 217, 222 (Ala.2002). Accordingly, Kirksey is not entitled to relief on this claim of error.
C.
Kirksey also claims error in the admission of Det. Farris’s “Uniform Incident/Offense Reports” (“I/O reports”), admitted as State’s Exhibits 4 and 9, because, he says, they contained inadmissible hearsay and were used by the State to argue that Kirksey had changed his.story. At trial, Kirksey objected to “any testimony regarding any statements given by Mr. Kirk-sey,” but he did so only because, he alleged, there had been “no evidence [that a] crime has occurred.” (R. 1488.)' Because Kirksey raises, for the first time on appeal, the specific argument that the I/O reports should not have been admitted because they contained inadmissible hearsay, this claim is reviewed for plain error. See Rule 45A, Ala. R.App. P.
Rule 805, Ala. R. Evid., establishes that “[hjearsay within hearsay is not excluded under the hearsay rule if each part of the combined statements conforms with an exception to the hearsay rule provided in these rules.” The Advisory Committee Notes to that rule instruct that “[i]nstanc-es arise in which an out-of-court statement by one declarant contains a statement made by yet another declarant” and that, for such a statement to be admissible, “[e]ach declarant’s statement, considered individually, must satisfy the hearsay concern by either qualifying under a hearsay exception or being, by definition, nonhear-say.”
The portion of Det. Farris’s testimony on direct examination that served as the foundation for State’s Exhibits 4 and 9 established only that they were notes she took regarding her conversations with Kirksey. “The definition of hearsay includes a statement made outside the trial by a declarant who takes the witness stand at trial to recount the previous statement and is subject to cross-examination.” Taylor v. State, 808 So.2d 1148, 1193 (Ala.Crim.App.2000); Because the interchange between the prosecutor and Det. Farris did not demonstrate that the statements qualified under a hearsay exception or were, by definition, nonhearsay, the State’s attempt at laying a foundation for the admission of the I/O reports failed to satisfy the hearsay concerns as to those exhibits. We conclude, therefore, that it was error to admit the I/O reports.
A finding of error, however, does not end our analysis; we must now determine whether the erroneous admission of the I/O reports was harmless. We begin by recognizing that the. exhibits are Det. Far-ris’s statements relating comments attributed to Kirksey and, therefore, constitute “hearsay within hearsay.” Rule 805, Ala. R. Evid. As to Det;, Farris’s statements that are contained in the I/O reports, “[t]his Court has long held that the erroneous admission of evidence that is merely cumulative is harmless error.” Surratt v. State, 143 So.3d 834, 840 (Ala.Crim.App.2013), citing Dawson v. State, 675 So.2d *853 897, 900 (Ala.Crim.App.1995), aff'd, 675 So.2d 905 (Ala.1996).
The information contained in State’s Exhibit 4, a summary of the interview of Kirksey conducted on April 16, 2006, is essentially the same as Det. Farris’s testimony that was adduced' during the trial. Much of the same information in State’s Exhibit 4 is also contained in State’s Exhibits 2 and 3, Kirksey’s handwritten statements he made' during the questioning, which were properly admitted at trial.
Similarly, the information contained in State’s Exhibit 9, a summary of the interview of Kirksey that was conducted'on April 18, 2006, is essentially the same as Det. Farris’s trial testimony and is also contained in State’s Exhibit 8, Kirksey’s handwritten statement he made during questioning, which was properly admitted into evidence.
Our review of the evidence causes us to conclude that the information in State’s Exhibits 4 and 9 were cumulative to testimony and other evidence that was properly admitted at trial and that their admission was harmless error. Moreover, the objectionable evidence was not only cumulative to other similar evidence, it was not of particular importance to the prosecution of Kirksey because Kirksey testified at trial. See Featherston v. State, 849 So.2d 217, 222 (Ala.2002).
Although we recognize that State’s Exhibit 4- contains references to Kirksey’s having “changed his story” (Kirksey’s brief, p. 80), those references do not alter our conclusion that the' error of its admission was- harmless. The first referencé to Kirksey’s having changed his story was made when, after having told Det. Farris he had found Cornell bleeding on the floor after coming out of the bathroom, Kirksey then told her that, while roughhousing, Cornell had hit his head on the headboard. Although she did not use the words “changed his story” during her testimony, Det. Farris stated that Kirksey, had originally told her that he came out of the bathroom and found Cornell bleeding on the floor; however, she testified that, after being informed that Cornell had suffered a head injury, Kirksey then stated “[o]h, I was roughhousing with Cornell” and told her about Cornell’s head hitting the headboard of the bed. (R. 1482-83.) Further, in State’s Exhibits 2 and 3 Kirksey, himself, wrote two distinct versions of the events of April 15, 2006. Thus, because the testimony and evidence that was properly admitted at trial shows without any doubt that Kirksey changed his story in this regard, there was no harm in the change being referenced in State’s Exhibit 4.
The second reference to Kirksey’s changing his story contained in State’s Exhibit 4 refers to the number of times he said that Cornell hit his head on the headboard. During her testimony, Det. Farris informed the jury that Kirksey said that Cornell had hit his head twice on the headboard, but, in State’s Exhibit 3, Kirksey wrote about Cornell having, hit his head on the headboard only once. The testimony and evidence that was properly admitted at trial demonstrates that Kirksey also changed his story about the number of times Cornell hit his head. There was no harm, therefore, in the reference in State’s Exhibit 4 to his having changed his story in this regard.
Similarly, the fact that State’s Exhibit 9 references Kirksey’s “previous story” involving Cornell’s head striking the. headboard does not alter our conclusion that the admission of that exhibit, was harmless. That version of events differs greatly from the “I stood on him” version, which was first told by Kirksey on April 18, 2006. There was, therefore, no harm in referring to it as a “previous story.”
*854 IX.
In- his' twelfth issue, Kirksey makes a twofold' argument that the trial court erred in not suppressing statements he made to officers with the Gadsden Police Department. He first argues that the “circumstances of his detention rendered the [Miranda v. Arizona, 384 U.S. 436 (1966),] waivers involuntary.” (Kirksey’s brief, p. 88.) Second, he argues that his Sixth, Amendment right to counsel had attached after Det. Farris' served him with the arrest warrant on a charge of capital murder and that, because officers spoke with him thereafter without the presence of an attorney, his April 18, 2006, statement should have been suppressed.
A.
Kirksey argues that, “[although [he] waived his Miranda rights before each statement, the circumstances of his detention rendered the waivers involuntary.” (Kirksey’s brief, p. 88.) Those circumstances, he argues, were being deprived of: (1) counsel, (2) access to a telephone, and (3) access to friends and family. “When reviewing a ruling on the voluntariness of a confession we use the standard set out by the Alabama Supreme Court in McLeod v. State, 718 So.2d 727 (Ala.1998).” Hyde v. State, 13 So.3d 997, 1013 (Ala.Crim.App.2007). In McLeod, the Supreme Court explained:
“For a confession, or an inculpatory statement, to be admissible, the State must prove by a preponderance of the evidence that it was voluntary. Ex parte Singleton, 465 So.2d 443, 445 (Ala.1985). The initial determination is made by the trial cotot. Singleton, 465 So.2d at 445. The trial court’s determination will not be disturbed unléss it is contrary to the great weight of evidence or is manifestly wrong. Marschke v. State, 450 So.2d 177 (Ala.Crim.App.1984):”
718 So.2d at 729.
In Wilkerson v. State, 70 So.3d 442 (Ala.Crim.App.2011), we outlined the principles that establish a knowing, voluntary, and intelligent waiver of Miranda rights:
“Tt has long been the law that a confession is prima facie involuntary and inadmissible, and that before a confession may be admitted into evidence, the burden is upon the State to establish voluntariness and a Miranda predicate.’ Waldrop v. State, 859 So.2d 1138, 1155 (Ala.Crim.App.2000), aff'd, 859 So.2d 1181 (Ala.2002). To establish a proper Miranda predicate, the State must prove that ‘the accused was informed of his Miranda rights before he made the statement’ and that ‘the accused voluntarily and knowingly waived his Miranda rights before making his statement.’ Jones v. State, 987 So.2d 1156, 1164 (Ala.Crim.App.2006). ‘Whether a waiver of Miromda rights is voluntarily, knowingly, and intelligently made depends on the facts of each case, considering the totality of the circumstances surrounding the interrogation, including the characteristics of the accused, the conditions of the interrogation, and the conduct of the law-enforcement officials .in conducting the interrogation.’ Foldi v. State, 861 So.2d 414, 421 (Ala.Crim.App.2002). ‘To prove [the] voluntariness [of the confession], the State must establish that the defendant “made an independent and informed choice of his own free will, that .he possessed the capability to do so, and that his will was not overborne by pressures and circumstances swirling around him.” ’ Eggers v. State, 914 So.2d 883, 898-99 (Ala.Crim.App.2004) (quoting Lewis v. State, 535 So.2d 228, 235 (Ala.Crim.App.1988)). As with the Miranda predicate, ‘when *855 determining whether a confession is voluntary, a court must consider the totality of the circumstances surrounding the confession.’ Maxwell v. State, 828 So.2d 347, 354 (Ala.Crim.App.2000). The State must prove the Miranda predicate and voluntariness of the confession only by a preponderance of the evidence. See, e.g., McLeod v. State, 718 So.2d 727 (Ala.1998) (State must prove voluntariness of confession by a preponderance of the evidence), and Smith v. State, 795 So.2d 788, 808 (Ala.Crim.App.2000)(St’ate must prove Miranda predicate by a preponderance of the evidence).
“Moreover, the United States Supreme Court has held that ‘[t]he sole concern of the Fifth Amendment, on which Miranda is based, is governmental coercion’ and that ‘[t]he voluntariness of a waiver of this privilege has always depended on the absence of police overreaching, not on “free choice” in any broader sense of the word.’ Colorado v. Connelly, 479 U.S. 157, 170, 107 S.Ct. 515, 93 L.Ed.2d 473 (1986). Likewise, the Supreme Court has held that ‘some sort of “state action”’ is required ‘to support a claim of [the] violation of the Due Process Clause of the Fourteenth Amendment.’ 479 U.S. at 165. In other words, ‘coercive police activity is a necessary predicate to the finding that a confession is not “voluntary” within the meaning of the Due Process Clause of the Fourteenth Amendment.’ 479 U.S. at 167. See also Quinlivan v. State, 627 So.2d 1082, 1086 (Ala.Crim.App.1992) (‘A statement is constitutionally involuntary only if it is the product óf coercion by government agents.’).”
70 So.3d at 460-61.
On February 4, 2010, Kirksey filed a “Motion to' Suppress Defendant’s Statement,” in which he sought to suppress statements he - had made to - law enforcement from April 15, ,2006,. through April 18, 2006.[13] During a hearing pn that motion the State called Det. Farris, who testified that, on April 15, 2006, after beginning her investigation, she spoke with Kirksey outside Yolanda’s apartment. Kirksey was arrested because, of an outstanding warrant and. was also, “placed on ■ hold for a felony warrant” so .he could not leave, the jail. (R. 284.)
Det. Farris further testified that, on April 16, 17, and 18, 2006, Kirksey was transported from the Etowah County Jail to her office at the GPD‘ facility. Each time he was brought there, Det Farris filled out the top portion of an advice-of-rights form, each of which was admitted into evidence, reviewed the form with Kirksey, and then allowed him to sign the waiver-of-rights portion of the form. ■ - Det. Farris- established that at no point did anyone, make threats or promises to Kirk-sey. or coerce him to get him to sign the waivers. On April 16, 2006, after waiving his rights, Kirksey spoke with Det. Farris for about an hour before writing a stater ment that was admitted as. State’s Exhibit 2. After being informed by Det. Farris about Cornell’s head injury, Kirksey then wrote another statement that was admitted as State’s, Exhibit 3. During their meeting, Det. Farris gave Kirksey a bathroom break .and had food brought in for the two of them. Kirksey never asked for an attorney and never said that he wanted to stop speaking with Det. Farris.
■ On April 17, 2006, after waiving his rights, Kirksey spoke with Det. Farris and wrote a statement that was introduced as State’s Exhibit 6. During that interview, Kirksey never indicated to Det. Farris that *856 he wanted to stop talking Or that he wanted to speak with an attorney.
During the interview on April 18, 2006, Kirksey was “eager to talk to [Det.’ Far-ris]” (R. 279.) During the conversation, Det. Farris told Kirksey about injuries Cornell had suffered, and: Kirksey provided explanations for those injuries. Kirk-sey also wrote a statement that was introduced as State’s Exhibit 8. Det.. Farris testified that at no point did- Kirksey indicate that he did not want to speak with Det. Farris or that he wanted an attorney and that, had Kirksey indicated at any time that he wanted an attorney, he would have been allowed access to one.
At the conclusion of the hearing, the trial court denied the motion to suppress. During the course of the trial, the defense renewed and the court overruled the objection as to each statement when it was offered into evidence.
We now specifically address Kirksey’s complaint regarding the deprivation of counsel, access to a telephone, and access to family and friends. Defendant’s Exhibit 1, admitted during the trial, was an “Eto-wah County Jail System Search- Charge File” for Kirksey that demonstrated that, while Kirksey was held following his arrest, he was not allowed access to a telephone at the request of Det. Farris. Section 36-10-16, Ala.Code 1975, provides:
“No officer or person having the custody and control of the body or liberty of any person under arrest shall refuse permission to such arrested person to communicate with his friends or with an attorney nor subject any person under arrest to any form of personal violence, intimidation, indignity or threats for the purpose of extorting from such person incriminating statements or a confession. Any person violating the provisions of this section shall be guilty.of a misdemeanor.”
“The'right to use a telephone is statutory and not constitutional.” Barrow v. State, 494 So.2d 884, 838 (Ala.Crim.App.1986). Further, § 36-10-16 “merely provides that an arrested person has a right ‘to communicate with his friends or with an attorney’ upon request.” Id. No evidence was admitted during the suppression hearing that established that Kirksey knew of the telephone restriction or that he ever requested to use a telephone. Every Miranda waiver he executed specifically informed him that he had the right to an attorney. The restriction of his access to a telephone was not a denial of his Sixth Amendment rights.
The trial court’s decision not to suppress Kirksey’s statements was neither contrary to the great weight of the evidence nor manifestly wrong. During the suppression hearing, the State established that, each time he spoke with Det. Farris regarding Cornell’s death, Kirksey made voluntary, knowing, and intelligent waivers of his Miranda rights and voluntarily made statements regarding the circumstances of Cornell’s death. Likewise, there is simply no evidence of any coercive police activity that would be indicative of an involuntary confession. We hold that it was not error for the trial court to deny the motion to suppress.
B.
Kirksey contends that the April 18, 2006, interrogation was a violation of his Sixth Amendment right to counsel because that right attached when Det. Farris served him with an arrest warrant on the capital-murder charge. The Sixth Amendment to the United States Constitution provides, in relevant part, that “[i]n all criminal prosecutions, the accused shall enjoy the right ... to have the Assistance of Counsellor his defense.”
*857 In addressing the right to counsel, the Alabama Supreme Court has instructed:
“A criminal defendant has a right-to counsel at any ‘critical stage’ in the proceedings in which he or she is prosecuted and sentenced, e.g., United States v. Wade, 388 U.S. 218, 224, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967), that is, at any stage at which a substantial right of the accused may be affected, Mempa v. Bhay, 389 U.S. 128, 134-36, 88 S.Ct. 254, 19 L.Ed.2d 336 (1967).”
Ex parte Pritchett, 117 So.3d 356, 358 (Ala. 2012). In Ex parte Cooper, 43 So.3d 547, 549 (Ala.2009), the Alabama Supreme Court, in applying the holding in Rothgery v. Gillespie County, Texas, 554 U.S. 191, 128 S.Ct. 2578, 171 L.Ed.2d 366 (2008), provided guidance as to when the Sixth Amendment right to counsel attaches, Because “the United States Supreme. Court [has] unequivocally defined the point at which a defendant’s right to counsel attaches in criminal proceedings” as the start of adversarial judicial proceedings, the Court “[held] that a defendant’s Sixth Amendment right to counsel attaches at the initial appearance.” Ex parte Cooper, 43 So.3d at 549; Quince v. State, 721 So.2d 245, 248 (Ala.Crim.App.1998) (the Sixth Amendment right to counsel “does not attach until the defendant is indicted or arraigned,” citing Michigan v. Jackson, 475 U.S. 625, 629, 106 S.Ct. 1404, 89 L.Ed.2d 631 (1986)).
At the time of the April 18, 2006, interview, Kirksey had not yet had an initial appearance. Thus, Kirksey’s Sixth Amendment right to counsel had not yet attached. The trial court did not err when it denied the motion to suppress Kirksey’s final statement.
X.
In his tenth argument, Kirksey contends that the trial court committed error in allowing the State to ask Dr. Shaker a hypothetical question-while prohibiting the defense, from asking'a hypothetical'question of the same expert.
A.
Kirksey first argues that it was error for the court to allow the prosecutor to ask and receive an answer from Dr. Shaker in the following exchange:
“[Prosecutor]: Well, let me ask you this, Dr. Shaker: What if I were to pick up that little twenty-three-month-old child, raise him over my head and throw him down against the floor; could it be caused that way?
“[Defense counsel]; Judge, I’m gonna object to, the facts that are not in evidence.
“[Prosecutor]: It’s a hypothetical.
“The Court: Overruled.
“[Prosecutor]: Could it be caused that way?
‘Witness: Can I answer, Your Honor?
“The Court: Yes,
“A. One other theory — it’s theory. I was not a witness at that scene, a witness = to the blunt force injuries.- But what happened, I was not a witness at that crime scene.
“[Prosecutor]: Okay. But what I’m asking you is if I -were to pick up that little boy, hold him over my head and throw him down against a hard, blunt object where the back of his head struck that object, is that-consistent with having caused the injury that you found when you opened that baby’s head up?
“A. Yes, it is.”
(R. 1679-80.)
We begin- our analysis by noting that, although Kirksey objected the first time the hypothetical question was asked, Dr. Shaker did mot answer that question. Kirksey failed to raise any objection when *858 Dr. Shaker was asked and answered a modified form of the hypothetical question.
“Review on appeal is limited to review of questions properly and timely raised at trial.” Newsome v. State, 570 So.2d 703, 716 (Ala.Crim.App.1989). Because the record demonstrates that Kirksey did not object, to the question answered .by Dr. Shaker, we review this claim for plain error. See Rule 45A, Ala. R.App. P.
The Alabama Supreme Court has explained:
“Rule 703, . Ala. R. Evid., requires that the facts or data relied upon by the expert in testifying and procured by the expert other than by firsthand knowledge generally must "be admitted into evidence. See Charles Gamble, McEl-roy’s Alabama Evidence § 127.02(5) (5th. ed.1996). It is clear that under Alabama law the State must introduce into evidence the information upon which an expert relies. See Ex parte Wesley, 575 So.2d 127, 130 (Ala.1990)(holding that reversible error occurred where expert, in giving opinion on defendant’s medical condition, based opinion in part on police reports and medical records that were not admitted into evidence).” . .
Ex parte Deardorff, 6 So.3d 1235, 1242-43 (Ala.2008).
The fact's, that formed the basis of the hypothetical question asked of Dr. Shaker were: (1) that Cornell had been picked up and held over Kirkseys. head;' (2) that Cornell had been “thrown”; (3) .that Cornell’s head had struck a hard, blunt object; and (4) that. Cornell’s head , had sustained a severe injury. A review of the record demonstrates that those facts .had been admitted into evidence. Furthermore, Det. Farris testified that, during the April 16, 2006, interview, Kirksey told her that he had “held [Cornell] up over [his] bead and. he fell,” hitting his head on the headboard. (R...1483,) On April 17, 2006, Kirksey-told Det. Farris that he had Cornell “up over [his]-head and he would fall” and-, that Cornell struck the headboard with his head;. Kirksey indicated that this had happened twice. (R. 1496.) Thus, the facts that were admitted at trial sufficiently established a basis to allow the portion of the question regarding whether Cornell had been picked up, held over someone’s head,- and dropped. Dr. Shaker testified that Cornell’s internal injuries could have been caused from falling from a height of at least six feet. Dr. Shaker also testified that Cornell’s injuries could not have been caused by hitting his head on. a headboard after someone tossed him onto the bed.
During his interview with Det. Farris that was conducted on April 18, 2006, after relaying how he had stood on and kicked Cornell, Kirksey told Det. Farris that Cornell had fallen -while he was running with Cornell. Also on April 18, 2006, Kirksey wrote a version of that same event; that version was admitted as State’s Exhibit 8. During direct examination, Yolanda testified that, when she returned home after leaving her other children at Simmons’s apartment, Kirksey “came running down the stairs to tell [her] that something [was] wrong with Cornell.” (R. 1304.) ' Upon entering the bedroom, she found Cornell lying on the floor, bleeding; she also found blood on the floor beside his head. That is where Cornell was found by the paramedics when they entered the apartment. ■ In State’s Exbibit 4, which contains the notes Det. Farris made about,.the April 16, 2006, interview of Kirksey, she noted that he had told her that, “after Cornell went to the hospital, [Kirksey] cleaned blood off the floor_” During the cross-examination of Colegrove, it was established that both floors of the apartment are concrete slabs. The evidence adduced at trial established, therefore, that Cornell was on .the floor, which was a hard, blunt object. The. fact that Cornell was found on the *859 floor gave a sufficient basis to the hypothetical question regarding whether Cornell’s head injury could have been caused by his having struck a hard, blunt object.
Kirksey takes issue, however, with the use of the word “throw” in the hypothetical question and cites Wal-Mart Stores, Inc. v. Orr, 29 So.3d 210 (Ala.Civ.App.2009), in support of his claim of error. In Wal-Mart Stores, Inc., the Alabama Court of Civil Appeals held that a hypothetical question posed of a doctor “was, a substantively inaccurate representation of the evidence before the trial court at trial.... ” Wal-Mart Stores, Inc., 29 So.3d at 216.
According to Merriam-Webster’s Collegiate Dictionary 1303 (11th ed.2003), one definition of the word “throw” is “to cause to fall.” The same source defines the word “drop” as “to let fall: cause to fall.” Merriam-Webster’s Collegiate Dictionary 382 (11th ed.2003). , Based on the facts that had been admitted at trial, the use of the word “throw” did not cause the.hypothetical question to become , a “substantively inaccurate representation.” Wal-Mart Stores, Inc., 29 So.3d at 216.
We hold' that the. hypothetical question presented to Dr. Shaker was based on sufficient facts that had been admitted into evidence. We further conclude that, because, in his preliminary report, Dr. Shaker mentioned “that the cause of death was blunt force trauma to the head and chest” and .because he testified that, even if Cornell had never suffered a head injury, his internal injuries would have been fatal (R. 1673), even if the trial court had committed error in permitting the State to ask Dr. Shaker fhe hypothetical question, the error would' have been harmless.
B.
Kirksey also argues that, because the trial court allowed the prosecutor to ask the hypothetical question discussed above, it erred in denying him the opportunity to ask Dr. Shaker, on cross-examination, whether Cornell’s head injury was “consistent with an accidental fall down a flight of stairs.” (Kirksey’s brief, p. 83.) He cites Davis v. Alaska, 415 U.S. 308, 94 S.Ct. 1105, 39 L.Ed.2d 347 (1974), in support of his argument. In Davis, however, the United States Supreme Court explained:
“Cross-examination is the principal means by which the believability of a witness and the-truth-.of his testimony are tested. Subject always to the broad discretion of a trial judge to preclude repetitive and unduly harassing interrogation,- the cross-examiner is not only permitted to delve into the witness’ story to test the witness’ perceptions and memory, but the cross-examiner has traditionally been allowed to impeach, i.e., discredit, the witness.”
415 U.S. at 316.'
Kirksey was allowed to conduct effective cross- and re-cross-examinations of Dr. Shaker, fully exploring the bases of his conclusions, confronting him with a learned treatise, and impeaching him with two forms of impeachment. Kirksey , tested the believability and truth of Dr. Shaker’s testimony. The principles found , in Davis were not violated when the trial court prevented Kirksey from asking a hypothetical question .because sufficient evidence had not been adduced at trial to allow the question to be asked.
Testimony established that, on April 18, 2006, while being interviewed by Det. Far-ris and Sergeant Chris Haney, Kirksey was specifically asked whether Cornell had been thrown down the stairs of the apartment and Kirksey replied that he had not. Further, at no point during any of.the interviews with Det. Farris or in any written statement did Kirksey ever indicate that the stairs had any connection with any of Cornell’s injuries. Even during his tes *860 timony at trial, Kirksey never attributed a fall on the stairs as having caused any of Cornell’s injuries. As we noted in the previous section of this opinion, Rule 703, Ala. R. Evid., requires that the facts or data relied upon by the expert in testifying and procured by the expert other than by firsthand knowledge generally must be admitted into evidence. There was no evidence connecting the stairs with Cornell’s injuries.
In deciding whether to allow defense counsel to ask the hypothetical question related to the stairs, the trial court correctly recognized that the issue was not whether Cornell had ever been on the stairs. but, rather, was whether he had suffered his fatal injuries as a result of having fallen on the stairs. No evidence was introduced at trial .suggesting that any of Cornell’s injuries, including the fatal head wound, had occurred as a result of his having fallen on the stairs. It was not error for the trial court to prohibit Kirksey from asking the hypothetical question regarding the stairs.
XI.
In his fifth issue, Kirksey argues that it was error for the trial court to have allowed Det. Farris to testify that, when she ran his name “through NCIC, he kicked back a warrant” for “failure to appear.” (R. 1445.) His argument is based on the presumptive inadmissibility of evidence relating to prior crimes. Because Kirksey did not object when the information was introduced at trial, we review this claim for plain error. See Rule 45A, Ala. R.App. P.
During cross-examination, Det. Farris . clarified that the warrant was for failing to appear on charges of driving while his license was suspended and driving without insurance. Defendant’s Exhibit' 1, admitted without objection from the State during cross-examination of Det. Farris, is an “Etowah County Jail System Search Charge File.”-That document listed Kirk-se/s previous contacts with law enforcement, consisting of one charge of driving while his license was revoked or suspended, in violation of § 32-6-19, Ala.Code 1975; one charge of driving without insurance, in violation of § 32-7A-16, Ala.Code 1975; and one charge of driving with a switched tag, in violation of § 40-12-265, Ala.Code 1975.
“Prior arrests of the accused on other charges which have nó relevancy except as tending to show his, bad character are not admissible.... ” Ex parte Johnson, 507 So.2d 1351, 1353 (Ala.1986). In Ex parte Johnson, on which Kirksey relies, the front of a fingerprint card that “contained information which clearly revealed the de-fénd'ant’s past contacts with law enforcement agencies” was admitted into evidence. Ex parte Johnson, 507 So.2d at 1357. The front of the card also contained aliases used by the defendant. Id. at 1354. The Alabama Supreme Court held that the introduction of the card into evidence constituted plain error because the exhibit “contained information which clearly revealed the ‘ defendant’s past contacts with law enforcement agencies,” which would have allowed the “jury [to] infer[], at a minimum, that he had been arrested in the past.” Id. at 1367. In Ex parte Woodall, 730 So.2d 652 (Ala.1998), ariother case on which Kirksey relies, the Alabama Supreme Court held that the trial'court committed plain error “in allowing the State to présent evidence to prove that the defendant had in fact committed ... three uncharged violent acts.” Ex parte Woodall, 730 So.2d at 663 (emphasis added).
More recently, the Alabama Supreme Court affirmed a capital-murder conviction even though the defendant’s fingerprint card from an earlier arrest, which included the defendant’s personal information, the date the prints had been taken, a charge of *861 “Harassment (DV),” and the date of the offense had been admitted at trial. Ex parte Belisle, 11 So.3d 323, 334-35 (Ala.2008). This was, in part, because the card was part of an exhibit that containéd several other documents but also because the card did not contain an alias, as in Ex parte Johnson, and listed, only one charge.
We have been unable to locate any case in which a reference to a failure to appear for a hearing on traffic citations constituted plain error or grounds for reversing a conviction of capital murder. In the case before us, the jury did not learn of prior violent acts or multiple arrests; it learned only that Kirksey had received traffic citations that he had not resolved before April 15, 2006. It is not reasonable to believe that, having learned that a warrant had been issued for Kirksey’s arrest due to his failure to appear on charges of driving while his license was revoked or suspended and driving without insurance, a jury would have been more likely to convict Kirksey on a charge of capital murder. “ ‘It is inconceivable that a jury could have been influenced, under the circumstances here, to convict [the appellant] of crimes of thé magnitude charged here because of an oblique reference to a prior criminal record.’” Belisle v. State, 11 So.3d 256, 293 (Ala.Crim.App.2007) (quoting Thomas v. State, 824 So.2d 1, 20 (Ala.Crim.App.1999), overruled on other grounds, Ex parte Carter, 889 So.2d 528 (Ala.2004)): Any speculation the jury may have had over Dei Farris’s stating that Kirksey had “kicked back” a warrant was eliminated by the revelation of what the warrant was for.
We hold, therefore, that Det.' Farris’s testimony regarding this information was not error, plain or otherwise:
XII.
In his eighth issue, Kirksey contends that the trial court erred in allowing the State to engage in improper cross-examination of Dr. Allen Shealy, Kirksey’s mitigation expert who testified during the sentencing hearing. Specifically, he complains that the prosecutor was allowed to ask Dr. Shealy a “lengthy series of ‘questions concerning how children experience different acts of violence.” (Kirksey’s brief, p. 73.) Kirksey claims that this series of questions constituted error for three reasons: (1) it sought information that “was beyond the scope of [Dr. Shealy’s] expertise and therefore lacked any probative' value”; (2) it invaded the province of the jury; and (3) the jury did not need assistance in evaluating whether the crime was especially heinous, atrocious, or' cruel as compared to other capital murders. (Kirksey’s brief, pp. 73-77.) See § 13A-5-49(a)(8), Ala.Code 1975. Because Kirk-sey did not object to this line of questioning, we review this ciaim for plain error. See Rule 45A, Ala. R.App. P.
A.
Kirksey first argues that the line of questioning sought to elicit information that “was beyond the scope of [Dr. Shealy’s] expertise and therefore lacked any probative value.” (Kirksey’s brief, p. 74.) The Alabama Supreme Court has written:
“The scope of cross-examination in Alabama is quite broad. Rule 611(b), Ala. R. Evid. This means that any question may be asked on cross-examination that is relevant either to any substantive issue in the' ease or to the witness’s credibility. See Rule 611(b), Ala. R. Evid., Advisory Committee’s Notes.”
Ex parte Deardorff, 6 So.3d 1235, 1241 (Ala.2008).
This Court has noted:
“ ‘ “Cross-examination is the principal means by which the believability of a witness and the truth of his testimony are tested. Subject always to *862 the broad discretion of a trial judge to preclude repetitive and unduly harassing interrogation, the cross-examiner is not only permitted to delve into the witness’ story to test the witness’ perceptions and memory, but the cross-examiner has traditionally been , allowed to impeach, i.e., discredit, the witness.”
“ ‘[Davis v. Alaska,] 415 U.S. [308,] 316, 94 S.Ct. 1105, 39 L.Ed.2d 347 [ (19.74) ]. “ ÍThe latitude and extent of cross-examination, or necessity, is a matter within the sound discretion of the trial court, and, in the absence of prejudicial abuse, it is not renewable on appeal.’ Turner v. State, 289 Ala. 97, 100, 265 So.2d 883 (1972).” Ashurst v. State, 462 So.2d 999, 1008-09 (Ala.Crim.App.1984).’ ”
Albarran v. State, 96 So.3d 131, 164-65 (Ala.Crim.App.2011) (quoting Marshall v. State, 20 So.3d 830, 835 (Ala.Crim.App.2008)).
Dr. Shealy answered affirmatively when asked whether, based on his training and experience, he was “in a position to render an opinion as to what effect trauma might have on a child psychologically.” (R. 2246.) His testimony established that the line of questioning was not beyond .the scope of his area of expertise, as Kirksey argues. The fact that Dr. Shealy presented himself , as being qualified to present such testimony also disposes of Kirksey’s claim that Dr. Shealy’s “assessment of whether Mr. Kirksey’s alleged conduct in this case qualified as ‘heinous’ or ‘cruel’ was neither relevant to nor probative of this statutory aggravator.” (Kirksey’s brief, p. 75.) It was both; the aggravating circumstance “may lawfully be applied if psychological ... torture were inflicted on the victim.” Turner v. State, 924 So.2d 737, 795 (Ala.Crim.App.2002). The line of questioning was also relevant and probative because it tested how extensively Dr. Shealy had reviewed the case before forming his opinion. In response to a question régarding whether the intentional infliction of severe pain on a child by someone with whom he was attached would be torturous, Dr.- Shealy stated that he had not “see[n] any evidence that this man had done anything intentionally to torture [Cornell].” (R; 2248-49.) He then testified that he had seen Kirksey’s written statements but had not seen the autopsy report. We conclude- that the line of questioning was not beyond the scope of Dr. Shealy’s area of expertise and that it did have probative value.
B.
Kirksey next argues that the line of questioning invaded the province of the jury. Rule 704, Ala. R. Evid., referenced by Kirksey, states that' “[t]estimony in the form of an opinion or inference otherwise admissible is to be excluded if it ethbraces an ultimate issue to be decided by the trier of fact.” Rule 1101(b)(3), Ala. R. Evid., however, specifically provides that the rules of evidence do not apply in sentencing hearings. Under § 13A-5-45(d), Ala. Code 1975, “[a]ny evidence which has probative value and is relevant to sentence shall be received at the sentencing hearing regardless of its admissibility under the exclusionary rules of evidence.” In addressing an argument similar to the one before us, we have written that “the ultimate issue rule did not apply during the sentencing proceedings, and the testimony was not improper on that basis.” Barber v. State, 952 So.2d 393, 455 (Ala.Crim.App.2005) (quoting Wilson v. State, 777 So.2d 856, 881 (Ala.Crim.App.1999), aff'd, 777 So.2d 935 (Ala.2000)). We hold that the same is true in this case; the testimony was proper because the ultimate-issue rule did not apply during the sentencing phase of the trial.
*863 C.
Finally, Kirksey argües that the line of questioning “was improper because the jury did not need expert assistance to evaluate whether a particular offense is especially heinous, atrocious, or cruel.” (Kirk-Bey’s brief, p; 76.) He again cites Rule 704, Ala. R. Evid., to support this argument. As noted above, Rule 1101(b)(3), Ala. R. Evid., specifically provides that the rules of evidence do not apply in sentencing hearings. Further, under’ § 13A-5-45(d), Ala.Code 1975, “[a]ny evidence which has probative value and is relevant to sentence shall be received at the sentencing hearing regardless of its admissibility under the exclusionary rules of evidence
“This Court has often stated:
“ ‘ “When considering whether a particular capital offense was ‘especially heinous, atrocious or cruel,’ this Court adheres to the standard set out in- Ex parte Kyzer, 399 So.2d 330, 334 (Ala.1981), namely, that the particular offense must be one of those ‘conscienceless or pitiless homicides which are unnecessarily torturous to the victim.’” Duke v. State, 889 So.2d 1, 36 [ (Ala.Crim.App.2002) ].’ ”
Beckworth v. State, 946 So.2d 490, 522 (Ala.Crim.App.2005) (quoting Yeomans v. State, 898 So.2d 878, 905 (Ala.Crim.App.2004)).
The aggravating circumstance that a murder is especially heinous, atrocious, or cruel compared to other offenses “may lawfully be applied if psychological or physical torture were inflicted on the victim.” Turner v. State, 924 So.2d 737, 795 (Ala.Crim.App.2002). The appellant in Barber v. State, 952 So.2d 393 (Ala.Crim.App.2005), similarly argued “that the trial court improperly allowéd- [an investigator] to testify that the victim’s murder was especially heinous, atrocious, or cruel when compared to other capital cases in which he had been involved.” Barber v. State, 952 So.2d at 454. We concluded “that the testimony was relevant to assist the jury in determining whether the especially heinous, atrocious, or cruel aggravating circumstance applied.” Id. at 456. The record “did not indicate that the jury or the trial court applied an incorrect standard in finding that the especially heinous, atrocious, or cruel aggravating circumstance existed.” Id. at458.
In the instant case, :the- record likewise, does not indicate that; either the jury or the trial court applied an incorrect standard in finding that the aggravating circumstance existed. .It was not error for the court to admit the testimony about which Kirksey complains to assist the jury in determining whether torture was inflicted on Cornell.[14]
XIII.
For his thirteenth issue, Kirksey asserts that, during the penalty phase, the trial court erred when instructing the jury on mitigating evidence. He contends that the “trial court never tolcl jurors that a mitigating circumstance..,did not have to be found to exist unanimously before being *864 considered,” specifically arguing that the court “discussed the jury’s consideration of mitigating circumstances by referring to the jury as one unit, i.e., ‘you’ or ‘your.’ ” (Kirksey’s brief, p. 90.) He also argues that “(t]he trial court never distinguished between the unanimity requirement for aggravating circumstances and the option for an individual juror to consider and weigh any mitigating factor, even if not agreed upon by the whole jury.” (Kirksey’s brief, pp. 90-91.)
Because, at the conclusion of the trial court’s* instructions, Kirksey failed to object to the court’s jury instruction, we review this claim for plain error'. See Rule 45A, Ala. R.App. P.
In Scott v. State, 163 So.3d 389 (Ala.Crim.App.2012), we recently rejected an argument “that the [trial] court’s instructions erroneously allowed the jury to believe that it could not consider a mitigating circumstance unless the entire jury agreed upon its existence.” 163 So.3d at 458. In the instant case, as in Scott, the jury instructions, when viewed in their entirety, “did not imply that the jurors had to unanimously agree on a mitigating circumstance before finding that a mitigating circumstance was present.” Id. at 459. “We have considered the trial court’s charge to the jury in light of the holding in Mills [v. Maryland, 486 U.S. 367 (1988)], and are of the opinion that the jurors could not have reasonably believed that they were required to agree unanimously on the existence of any particular mitigating factor;” Ex parte Martin, 548 So.2d 496, 499 (Ala.1989) (opinion on rqhearing). In Smith v. Spisak, 558 U.S. 139, 130 S.Ct. 676, 175 L.Ed.2d 595 (2010), the United States Supreme Court expounded upon Mills and wrote:
“[T]he instructions did not say that the jury must determine the existence of each individual mitigating factor unanimously. Neither the instructions nor the forms said anything about how — or even whether — the jury should make individual determinations that each particular mitigating circumstance existed. They focused only on the overall balancing question. And the instructions repeatedly told the jury to ‘eonside[r] all of the relevant evidence.’ ... In our view the instructions and verdict forms did not clearly bring- about, either through what they said or what they implied, the circumstance- that Mills found critical, namely,
“ ‘a substantial possibility that reasonable jurors, upon receiving the judge’s instructions in this case, and in attempting to complete the verdict form as instructed, well may have thought they were precluded from considering any mitigating evidence unless all 12 jurors agreed on the existence of a particular such circumstance.’ [Mills v. Maryland,] 486. U.S., [367] at 384 [(1988)].”
558 U.S. at 148.
We have also previously considered and rejected arguments based on the use of the words “you” and “your” by trial courts when charging on the consideration of mitigating evidence. See, e.g., Reynolds v. State, 114 So.3d 61 (Ala.Crim.App.2010); see also Hall v. State, 979 So.2d 125, 165-67 (Ala.Crim.App.2007). Kirksey’s argument on that basis is precluded by those decisions.
The court’s instructions, when taken as a whole, did not imply that the jurors had to unanimously agree on the existence of a mitigating circumstance. Considering the trial court’s charge to the jury in light of Mills and Smith v. Spisak, we “are of the opinion that the jurors could not have reasonably believed that they were required to agree unanimously on the existence of any. particular mitigating factor.” Ex *865 parte Martin, 548 So.2d at 499. We, therefore, find no error, plain or otherwise.
XIV.
In his seventh issue, Kirksey asserts that, on multiple occasions, the prosecutor improperly inflamed. the passions of the jury-
A.
Kirksey first argues error by the prosecutor during jury selection and throughout the trial using certain adjectives’and terms to describe both Cornell and the case the jury would hear. Although defense counsel “ask[ed] the Court to warn the State” about “go[ing] overboard” with descriptions of Cornell or appeals to emotion, Kirksey did not object when the adjectives of which he now complains were used. Our review is, therefore, limited to determining whether the alleged error amounted to’ plain error. See Rule 45A, Ala. R.App. P.
Regarding Kirksey’s argument regarding the prosecutor’s use of adjectives such as “beautiful” and “innocent” during voir dire, we find the case of Reynolds v. State, 114 So.3d 61 (Ala.Crim.App.2010), to be helpful. In Reynolds, we addressed an argument regarding allegedly improper comments made during voir dire. Wé concluded that a review of the comments, when viewed in context, did not create an unfairness that resulted in a denial of due process. Likewise, a review of the comments of which Kirksey complains in their rightful context demonstrates that they did not “infect[ ] the trial with unfairness [so] as to make the resulting conviction a denial of due process.” Id. Regarding comments made during closing argument, Kirksey cites Viereck v. United States, 318 U.S. 236, 63 S.Ct. 561, 87 L.Ed. 734 (1943), in support of his argument. During closing argument, the federal prosecutor in Viereck stated:
“ ‘In closing, let me remind you, ladies and gentlemen, that this is war. This is war, harsh, cruel, murderous war. There are .those who, right at this very moment, are plotting your death and my death; plotting pur death and the death of our families because we have committed no other crime than that we do not agree with their ideas of persecution and concentration camps. This is war. It is a fight to the death. The American people are relying upon you ladies and gentlemen for their protection against this sort of ⅞ crime, just as-much as they are relying, upon the protection, of the Men [sic] who man the guns in Bataan Peninsula, and everywhere else. They are relying upon you ladies and gentlemen for their protection. We are at war. You have a duty to perform here. As a representative of your Government I am calling upon every one of you to do yourduty.’” "'
Viereck, 318 U.S. at 248.
In contrast, Kirksey complains that Cornell was described as “beautiful,” as an “innocent child,” and as a “helpless twen-’ ty-three-month-old baby.” (Kirksey’s brief, p. 68.) He also complains about the prosecutor’s having commented that Cornell was “a day away from a visit with the Easter Bunny” and that Cornell “deserved] a jury to ... hear the case who cares about a child’s life.” Id.
Remarks of 'counsel, which are based on evidence admitted at-trial or which are a reasonable. inference from the evidence, are permissible. Broadnax v. State, 825 So.2d 134, 186-87 (Ala.Crim.App.2000), aff'd, 825 So.2d 233 (Ala.2001). In Broad-nax, the prosecutor described one victim as an “innocent ... little four-year-old boy.” Broadnax v. State, 825 So.2d at 186. The record in Broadnax revealed that it had been established at trial that the victim “had just begun preschool and that he *866 was four years and three months old at the time of his death.” Broadnax v. State, 825 So.2d at 186. We concluded, therefore, that “[b]ecause the arguments advanced by the prosecutor were derived from the evidence admitted at trial or a reasonable inference from the evidence ... no plain error occurred.” Broadnax v. State, 825 So.2d at 186-87.[15]
The evidence at trial established that Cornell'was less than two years 'old and still-wore diapers. ‘ It was-not error for the prosecutor to describe him as an “innocent child” or as a “helpless twenty-three-month-old- baby” because those descriptions were “derived from the evidence admitted at trial.” Broadnax v. State, 825 So.2d at 186-87. State’s Exhibit 47, which was admitted at trial, was a photograph of Cornell taken before.his death. It was not improper for the child in that, photograph to be described as “beautiful.” The evidence adduced at trial also established that April 16, 2006, the day after Cornell died, was Easter .Sunday. The prosecutor’s comment regarding a “visit with thé Easter Bunny” Was, therefore, a “reasonable inference from the evidence” that had been admitted during the trial. Id. Given the nature óf thé ¿ése, referring to the case as “upsetting” was also appropriate.
'Kirksey directs our attention to Arthur v. State, 575 So.2d 1165 (Ala.Crim.App.1990). ‘In that case, we cited an oft-quoted passage from Berger v. United States, 295 U.S. 78, 88, 55 S.Ct. 629, 79 L.Ed. 1314 (1935), in which the United States Supreme Court, writing of a prosecutor,' stated that, “while-he.may strike hard blows, he is not at liberty to strike foul ones.” Id. The prosecutor in this case did not strike foul blows. The phrases, and adjectives used to describe Cornell were based upon the evidence that had been admitted during trial, and their use was not error, plain or otherwise.
B.
Kirksey also asserts prosecutorial misconduct-when, during rebuttal, the prosecutor referred to him as an “animal.” The comment came during this portion of the prosecutor’s closing argument to the jury:
“And the only emotion — Teri Davis told you this.' You saw this man. on the witness stand. The only emotion he ever showed, while she was talking to him was when he gritted his teeth: ‘That pissed me off. When that little boy fell on the ground and started kicking, that pissed me off and I just stood on him.’ That’s an animal.”
(R. 2102.) Because Kirksey made no objection when the comment was made, we review this claim for plain error. See Rule 45A, Ala. R.App. P. Also,
“ ‘ “While this failure to object does not preclude review in a capital case, it does weigh against any claim of prejudice.” Ex parte Kennedy, 472 So.2d [1106,] at 1111 [(Ala.1985)] (émphasis in original). “This court has concluded that the failure to object to improper prosecutorial arguments ... should be weighed as part of our evaluation of the claim on the merits because of its suggestion that the defense did not consider the comments in question to be particularly harmful.” Johnson v. Wainwright, 778 F.2d 623, 629 n. 6 (11th Cir.1985), cert. denied, 484 U.S. 872, 108 S.Ct. 201, 98 L.Ed.2d 152 (1987).’
“Kuenzel v. State, 577 So.2d 474, 489 (Ala.Crim.App.1990) (emphasis omitted).
*867 “ ‘In judging a prosecutor’s closing argument, the standard is whether the argument “‘so infected the trial-'with unfairness as to make the resulting conviction a denial of due process.’ ” Darden v. Wainwright, 477 U.S. 168, 181, 106 S.Ct. 2464, 2471, 91 L.Ed.2d 144 (1986) (quoting Donnelly v. DeChristoforo, 416 U.S. 637, 643, 94 S.Ct. 1868, 1871, 40 L.Ed.2d 431 (1974)).
“ ‘ “In reviewing allegedly improper prosecutorial comments, conduct,, and questioning of witnesses, the task of this Court is to consider their impact in the context of the particular trial, and. not to view the allegedly improper acts in the abstract. Whitlow v. State, 509 So.2d 252, 256 (Ala.Cr.App.1987); Wysinger v. State, 448 So.2d 435, 438 (Ala.Cr.App.1983); Carpenter v. State, 404 So.2d 89, 97 (Ala.Cr.App.1980), cert. denied, 404 So.2d 100 (Ala.1981); Moreover; this Court has also held' that statements of counsel in argument to the jury must .be viewed as delivered in the heat of debate; such statements are usually valued by the jury at their true worth and are not expected to become factors in the formation of the verdict. Orr v. State, 462 So.2d 1013, 1016 (Ala.Cr.App.1984); Sanders v. State, 426 So.2d 497, 509 (Ala.Cr.App.1982).”
“‘Bankhead v. State, 585 So.2d 97, 106-07 (Ala.Crim.App.1989), aff'd in relevant part, 585 So.2d 112, 127 (Ala.1991), rev’d' on other grounds, 625 So.2d 1146 (Ala.1993). Finally,
“ ‘ “ ‘[djuring closing argument, the prosecutor, as well as defense counsel, has a right to present his impressions from the evidence, if reasonable, and may argue every legitimate inference.’ .Rutledge v. State, 523 So.2d 1087, 1100 (Ala.Cr. App.1987), rev’d on other grounds, 523 So.2d 1118 (Ala.1988) (citation omitted). Wide discretion is allowed the trial court in regulating the arguments of counsel. Racine v. State, 290 Ala. 225, 275 So.2d 655 (1973). ‘In evaluating allegedly prejudicial remarks by the prosecutor in closing argument, ... each case must be judged on its own merits,’ Hooks v. State, 534 So.2d 329, 354 (Ala.Cr.App.1987), aff'd, 534 So.2d 371 (Ala.1988), cert. denied, 488 U.S. 1050, 109 S.Ct. 883, 102 L.Ed.2d 1005 (1989) (citations omitted) (quoting Barnett v. State, 52 Ala.App. 260, 264, 291 So.2d 353, 357 (1974)), and the remarks must be evaluated in the context of the whole trial, Duren v. State, 590 So.2d 360 (Ala.Cr.App.1990), aff'd, 590 So.2d 369 (Ala.1991). ‘In order to constitute reversible error, improper argument must be pertinent to the issues at trial or its natural tendency must be to influence the finding of the jury.’ Mitchell v. State, 480 So.2d 1254, 1257-58 (Ala.Cr.App.1985) (citations omitted). ‘To justify reversal because of an attorney’s argument to the jury, this court must conclude that substantial prejudice has resulted.’ Twilley v. State, 472 So.2d 1130, 1139 (Ala.Cr.App.1985) (citations omitted).”
“‘Coral v. State, 628.So.2d 954, 985 (Ala.Crim.App.1992), aff'd, 628 So.2d 1004 (Ala.1993).’ ”
Albarran v. State, 96 So.3d 131, 182-83 (Ala.Crim.App.2011) (quoting Sneed v. State, 1 So.3d 104, 138-39 (Ala.Crim.App.2007)).
Kirksey concedes that, in Ex parte Melson, 775 So.2d 904 (Ala.2000), the Alabama Supreme Court agreed with this Court *868 that the use of the word “animal” during closing arguments of the guilt phase of a capital-murder trial was not plain error. Ex parte Melson, 775 So.2d at 907. Further, in Albarran, we quoted with approval Johnson v. Zant, 249 Ga. 812, 295 S.E.2d 63 (1982), in which the Supreme Court of Georgia wrote: “This court has held that flights of oratory, figurative speech, and false logic are not error requiring rever-sal_ These may include closing argument by the district attorney characterizing a defendant as a ‘brute, beast, an animal and a mad dog who did not deserve to live.’ ” Albarran, 96 So.3d at 186.
We hold that the prosecutor’s comment did not “so infect[ ] the trial with unfairness as to make the resulting conviction a denial of due process,” Darden v. Wainwright, 477 U.S. 168, 181, 106 S.Ct. 2464, 91 L.Ed.2d 144 (1986)(quoting Donnelly v. DeChristoforo, 416 U.S. 637, 94 S.Ct. 1868, 40 L.Ed.2d 431 (1974)), and that it did not rise to the level of plain error.
C.
Kirksey also claims error in the State’s eliciting from Dr. Shaker opinion testimony that informed the jury “that Cornell would have suffered ‘severe pain’ as a result of his injuries.” (Kirksey’s brief, p. 69.) The testimony about which Kirksey complains occurred when, while Dr. Shaker was being asked about the effects Cornell’s injuries would have had on him, the following exchange occurred:
“[Prosecutor]: What about pain?
“[Dr. Shaker]: Of course, severe pain.”
(R. 1675.) Because Kirksey made no objection at the time this statement was made, we review this claim for plain error. See Rule 45A, Ala. R.App. P.
In McCray v. State, 88 So.3d 1 (Ala.Crim.App.2010), Dr. Stephen Boudreau, a medical examiner, with the Alabama Department of Forensic Sciences who had been present when the autopsy was performed on the murdered victim, testified that the victim had suffered' a “total of nine ‘major’ stab wounds as wéll as numerous other superficial stab wounds and cuts oh her body.” McCray, 88 So.3d at 10. As to each wound that had been inflicted on the victim, the prosecutor elicited from Dr. Boudreau the “amount of blood loss that would likely have been associated with that wound, and whether the specific wound would have caused pain to [the victim],” and, during closing argument, referred to that pain. Id. at 38. In affirming the defendant’s conviction of capital murder and sentence of death, we held that “[t]hé pain and suffering of the victim is a circumstance surrounding the murder — a circumstance that is relevant and admissible during the guilt phase of a capital trial.” Id. (citing Smith v. State, 795 So.2d 788, 812 (Ala.Crim.App.2000)).
 We hold that it was not error, plain or'otherwisé, for the court to allow Dr. Shaker to testify about pain" Cornell suffered from the injuries he had received.
D.
Kirksey also complains that the “prosecutor exploited Det. Farris’s display of emotion, on the witness stand by bringing her tissues to wipe her eyes” and “by arguing, to. the jury that her tears were a reason to believe her testimony and disbelieve Mr. Kirksey.” (Kirksey’s brief, p. 70.) We note that, because Kirksey objected to neither’ the handing of the tissues to Det. Farris[16] nor the rebuttal-argument *869 reference to her emotions, our review is limited to determining whether the alleged error amounted to plain error. See Rule 45A, Ala. R.App. P.
1.
We first address Kirksey’s complaint regarding the handing of tissues to Det. Farris during her testimony. When this issue was mentioned at trial, the prosecutor stated that she had presented Det. Farris with tissues '“because once [she] saw that [she] thought [Det. Farris] was about to break into tears, [she] thought that that would be better if she had a minute to compose herself, as opposed to starting to sob on the witness stand.” (R. 1584.) Having found no Alabama case addressing this issue, we have looked to our sister states for guidance.
Although the decisions of courts in other states are not binding on this Court, we find the basis of the Kansas Supreme Court’s decision in State v. Richard, 252 Kan. 872, 850 P.2d 844 (1993),. to be persuasive. The defendant in Richard claimed that the trial judge erred in not granting his motion for a mistrial, which was made after the trial judge handed the victim a box of Kleenex during her testimony. Richard, 252 Kan. at 877, 850 P.2d at 849. , In holding that the trial court had not “exceeded any boundaries or levels of judicial propriety,” the court counseled that “[t]rials are frequently emotionally traumatic for witnesses who are personally involved in the events to which they are testifying. Acts of common courtesy should be encouraged, not discouraged.” 252 Kan. at 878, 850 P.2d at 849. We, likewise, will not discourage an act of common courtesy, and, therefore, we hold that it was not improper for the prosecutor to hand tissues to an emotional testifying witness.
2.
' Additionally, we are not convinced that it was improper for thé prosecutor, during rebuttal argument, to refer to Det. Farris’s tearfulness on the stand. It was a proper reference both to rebut defense counsel’s closing argument and to ask the jury to use it as a reason to find her credible. In its closing argument, defense counsel had argued that Det. Farris had decided “to tell [the jury] a story” because, defense counsel argued, claiming that Kirksey said that Cornell “ ‘pissed me off sounds better.” (R. 2128-29.) In other words, defense counsel implied that Det. Farris had, while under oath, lied to the jury. It was altogether proper for the prosecutor to respond to such an implication. ’ Viewed in that context, the prosecutor’s words are seen as an appropriate rebuttal to the assertion that had just been made by defense counsel:
“Is there a single one of you on this jury who believes Teri Davis[17] sat on that witness stand and lied? You saw how she felt about this case. You saw how she was affected even telling you what'this man had said.
“Was she just making all that up? Making it up, putting words in his mouth? Him saying ‘That pissed me off, so I kicked him and I stood on him’?
“And that’s something that’s in her mind that she came up with and it makes her cry to think about this story she came up with?”
(R. 2140.)
The comments were simply a request, following the argument made by defense counsel that Det. Farris’s testimony was not to be believed, that the jury find her credible. It is well settled in Alabama that credibility determinations are exclusively the province of the jury. See, e.g., *870 Anderson v. State, 354 So.2d 1156, 1159 (Ala.Crim.App.1977) (“The weight and credibility of the testimony was for the jury to determine.”); see also Byrd v. State, 24 Ala.App. 451, 451, 136 So. 431, 431 (1931)(“[T]he credibility of witnesses and the weight or probative force of testimony is for the jury to judge and determine.”). “The conduct of a witness on the stand is, of course, .a form of testimony;, his demeanor, is always in evidence when he testifies.” Sistrunk v. State, 455 So.2d 287, 290 (Ala.Crim.App.1984) (quoting Stewart v. United States, 275 F.2d 617, 624 (D.C.Cir.1960), rev’d on other grounds, Stewart v. United States, 366 U.S. 1, 81 S.Ct. 941, 6 L.Ed.2d 84 (19.61)).
Because they were used to rebut an argument made by defense counsel and because they were an appropriate request for the jury to determine a witness’s credibility, the prosecutor’s comments regarding the. fact that Det. -Farris cried while on the stand were not improper.
E.
Finally, Kirksey.arguqs that the prosecutor improperly inflamed the passions of the jury when,, during rebuttal, the prosecutor made a racially charged comment. Specifically, Kirksey claims that the statement that “ ‘those buttons y’all. are wearing don’t say I,.just fell off the turnip truck, I believe anything. This ain’t the O.J. case and it ain’t California.’ ... suggested to the overwhelmingly white jury in Mr. Kirksey’s case that it should not let a black man ‘get away with’ murder.” (Kirksey’s brief, p. 71.) Because he made no objection when the comment was made, we review this claim only for plain error. See Rule 45A, Ala. R'App: P. As noted in Part XIV.B., his failure to object weighs against his claim of prejudice.
It is well settled that “arguments calculated to invoke racial prejudice in the jury [are] improper.” Ivery v. State, 686 So.2d 495, 505 (Ala.Crim.App.1996). However, “[t]here is no impropriety in a prosecutor’s appeal to the jury for justice and to properly perform its duty.” Minor v. State, 914 So.2d 372, 421 (Ala.Crim.App.2004) (quoting Price v. State, 725 So.2d 1003, 1033 (Ala.Crim.App.1997), aff'd, 725 So.2d 1063 (Ala.1998)). We included in Ivery a collection of cases in which prosecutors’ comments were improper because they constituted .“race-baiting.” Ivery, 686 So.2d at 505. Those cases were:
“Moulton v. State, 199 Ala. 411, 412, 74 So, 454 (1917) (holding the prosecutor’s following’comments to be improper: ‘ “If you do not hang this negro, you will have a similar crime in this county in six months.... Unless you hang this negro, our white people living out in the country won’t be safe; to let such crimes go unpunished will cause riots in our land.... I hope to God the day will never come in this country when the heel of the Ethiopian will be on the neck of the Caucasian;” ’); ’ Tannehill v. State, 159 Ala. 51, 52, 48 So. 662 (1909) (holding the following argument by a prosecutor to be improper: ‘ “Th'e only defense to these confessions of the defendant, with the corroborating facts shown by [two witnesses], Is the alibi set up by a lot of negro witnesses. Why, gentlemen, if you acquit this man on such an alibi' as this, you can nevér expect to convict another negro of a crime in this country. You know the negro race — how they stick up to each other, when accused of crime, and that they will always get up an alibi, prove it by perjured testimony of their own col- or, and get their accused companion cleared if they can.” ’); Simmons v. State, 14 Ala.App. 103, 104, 71 So. 979 (1916) (holding the prosecutor’s following remark to be. improper: ‘ ‘You must deal with a negro in the light of the fact *871 that he is a negro, and applying your experience and common sense.” ’).”
Id. The comment of which Kirksey complains, needless to say, is in no way similar to those quoted in Ivery.
It is apparent in its context that, the' comment made by the prosecutor in this case was an appeal for the jury “to properly perform its duty;” Minor v. State, 914 So.2d at 421 (quoting Price v. State, 725 So.2d at 1033). Before the comment was made, the prosecutor stated: “They’re asking you to suspend your common sense and believe everything that [the other prosecutor] pointed out to you happened.” (R.2098.)' Immediately following the comment, the prosecutor said: “You’ve got common sense. You know what happened in this case. You don’t need me to tell you.” (R.2099.) It was not error, plain or otherwise, for the prosecutor to have made the comment.
Kirksey also asserts, without citation to authority, that • “[a] common perception among white Americans is that the jury’s verdict was wrong, and that Mr. [O.J.] Simpson was guilty,” and that the comment “suggested to the overwhelmingly white jury in Mr. Kirksey’s case that it should not let a black man ‘get away with murder.’ ” (Kirksey’s brief, p., 71.) , We have no reason to believe that the statement was such an appeal; therefore, Kirksey’s argument does not change our conclusion that it was not error for the prosecutor to make the comment.
'-XV.
Kirksey argues, in his fifteenth issue, that the trial court erred in finding that the murder of Cornell was “heinous, atrocious, or cruel.” He specifically argues that - that statutory aggravating circumstance is unconstitutionally vague. In addressing a similar argument, we explained:
“ “With respect to Minor’s constitutional challenge to the heinous, atrocious, or cruel aggravating circumstance in § 13A-5-49(8), Ala.Code 1975, this Court has repeatedly upheld that circumstance against similar challenges. See Duke v. State, 889 So.2d 1 (Ala.Crim.App.2002); Ingram v. State, 779 So.2d 1225 (Ala.Crim.App.1999), aff'd, 779 So.2d 1283 (Ala.2000); Freeman v. State, 776 So.2d 160 (Ala.Crim.App.1999), aff'd, 776 So.2d 203 (Ala.2000); Bui v. State, 551 So.2d 1094 (Ala.Crim.App.1988), aff'd, 551 So.2d 1125 (Ala.1989), judgment vacated on other grounds, 499 U.S. 971, 111 S.Ct. 1613, 113 L.Ed.2d 712 (1991); and Hallford v. State, 548 So.2d 526 (Ala.Crim.App.1988), aff'd, 548 So.2d 547 (Ala.1989).’
“[Minor v. State,] 914 So.2d [372] at 437 [ (Ala.Crim.App.2004) ]. See also Blackmon v. State, 7 So.3d 397 (Ala.Crim.App.2005); Lindsey v. Thigpen, 875 P.2d 1509, 1513-1514 (11th Cir.1989) (holding that Alabama construction of the especially heinous, atrocious or cruel aggravating circumstance to those conscienceless or pitiless homicides that are unnecessarily torturous . to the victim satisfies the narrowing requirement of the Eighth Amendment).”
McCray v. State, 88 So.3d 1, 74-75 (Ala.Crim.App.2010).
“Because [Kirksey’s] argumerits are contrary to established precedent, and he has offered this Court no principled reason to question the validity of that precedent, this issue does not entitle him to any relief.” McCray v. State, 88 So.3d at 75.
XVI.
Kirksey further argues, in his second issue, that the- trial court erred) when, instructing the jury on the element of intent. He also argues -that comments made by the prosecutor compounded the erroneous instructions. Because, following the charging of the jury and after the com *872 ments made by the prosecutor, Kirksey did not object to the instruction, we-review this claim for plain error. See Rule 45A, Ala. R.App. P. In reviewing a trial court’s instructions to a jury, “[tjhe entire charge must be construed as a whole.” Kennedy v. State, 472 So.2d 1092, 1103 (Ala.Crim.App.1984).
A.
Kirksey argues that the trial court’s instructions on intent: (1) improperly “led the jury to believe that it could find him guilty of capital murder as long as he intended to engage in the conduct” that caused Cornell’s death, (2) “eased the State’s burden of proof with respect to the element of specific intent and undermined the presumption of innocence,” and (3) “interfered with the jury’s ability, to consider convicting Mr. Kirksey of the lesser-included offenses of manslaughter and criminally negligent homicide.” (Kirksey’s brief, pp. 32-36)(emphasis in original.)
The record demonstrates that the trial court, after informing the jury that, under § 13A-5-40(a)(15), Ala.Code 1975, “[cjapi-tal murder is murder when the victim is less than fourteen years of age,” instructed that, under § 13A~6-2(a)(l), Ala,Code 1975, “[a] person commits the crime of murder if he or she does the following: [wjith intent to cause the death of another person, he or she causes the death of another person.” (R. 2150.) The trial court also instructed the jury that the first statute mentioned was to be considered in conjunction with the second.
The trial court next, in charging the jury on intent, instructed:
“Intent, ladies and gentlemen, is defined as a person — as a personal act. And a person acts intentionally with respect to a result or to conduct described by statute defining an offense when his purpose is to cause that result or to engage in that conduct.”
(R. 2150)(emphasis in original). Later, the trial court clarified the instruction on “intent,” charging:
“Intent must be specific and real- in a capital murder case. The defendant must act intentionally as opposed to negligently, accidently or recklessly to cause the death of the deceased in order , to convict the defendant of capital murder.
“You act intentionally with respect to a result or conduct when you have the purpose' to cause that result or to engage in that conduct.”
(R. 2154-55.)
Kirksey contends that the trial court’s references to “conduct” made these instructions erroneous.
Section 13A-2-2, Ala.Code 1975, defines “intentionally” as:
“A person acts intentionally with respect to a result or to conduct described by a statute .defining an offense, when his purpose is to cause that result or to engage in that conduct.”
1.
In Coral v. State, 628 So.2d 954 (Ala.Crim.App.1992), we considered' an argument that the following instruction “shifted the burden of proof on the intent element”:
“The defendant - commits the crime of murder of the intentional killing-type if with the intent to cause the death of another person he causes the death of that person, and a person acts intentionally with respect to a result or to conduct when his purpose is to cause that result or to engage in that conduct.”
628 So.2d at 987. We held that the instruction did not shift the burden and that it “was proper and follow[ed] the Alabama Pattern Jury Instructions: Criminal.” Id.
In Haney v. State, 603 So.2d 368 (Ala.Crim.App.1991), we noted that the trial court in that case had “properly instructed *873 the jury on the definition of intent under the law_” Haney, 603 So.2d at 397. In Haney, the definition of intent given to the jury was: “A person acts intentionally with respect to a result or to conduct when his purpose is to cause that result or to engage in that conduct.” Haney, 603 So.2d at 397. That definition ip substantially the same one given in this case.
In this case, the trial court correctly instructed the jury on the law of this State. The trial court not only instructed the jury on the definition of intent but also instructed the jurors that § 13A-6-2(a)(l), Ala. Code 1975, requires an “intent to cause death.” The instruction of which Kirksey complains did not lead the jury to believe that he could be found guilty as long as he intended to engage in the conduct leading to Cornell’s death. Construing the instructions as a whole, we hold that the instruction on intent was not improper.
2.
The trial court also instructed the jury that Kirksey was “presumed to be innocent until he is proven guilty beyond a reasonable doubt by the evidence in this case.” (R. 2155-56;) The trial court further instructed the jury that the presumption “is to be regarded ... as a matter of evidence .... ” (R. 2156.) The instructions in this case did not “ease[] the State’s burden 'of proof with respect to the element of specific intent [or] undermine! ] the presumption of innocence.” (Kirksey’s brief, p. 36.) We find no error in the instructions.
3.
Morever, the complained-of instruction did not interfere with the jury’s ability to consider lesser-included offenses. Kirksey specifically argues that the instruction on intent required jurors “to convict Mr. Kirksey of capital murder even if they believed that he merely recklessly or negligently caused Cornell’s death, as long as they believed that Cornell’s injuries were the-result of -his intentional conduct.” (Kirksey’s brief, p. 36) (emphasis in original).- In addition to. the-charge of capital murder, the trial court charged the jury on the elements of manslaughter and criminally negligent homicide. The trial court specifically charged the jury that, in order to convict Kirks'ey of capital murder, he had to have acted “intentionally as opposed to negligently, accidently, or recklessly to cause the death of [Cornell].... ” (R. 2154-55.). Again, ■ construing the instructions as a whole, we find no error in the instruction on intent.
B.
In footnote 16 in his brief, Kirksey argues that the “trial court’s instructions were also confusing because .they failed to articulate the elements of capital murder.” (Kirksey’s brief,-p. 35.)
In Scott v. State, 163 So.3d 389 (Ala.Crim.App.2012), we noted:'
“ ‘A trial court has broad discretion when formulating its jury instructions. See Williams v. State, 611 So.2d 1119, 1123 (Ala.Cr.App.1992). When reviewing a trial court’s instructions, “ ‘the court’s charge must be taken as a whole, and the portions challenged are not to be isolated therefrom or taken out of context, but rather considered together.’ ” Self v. State, 620 So.2d 110, 113 (Ala.Cr.App.1992) (quoting Porter v. State, 520 So.2d 235, 237 (Ala.Cr.App.1987)); see also Beard v. State, 612 So.2d 1335 (Ala.Crim.App.1992); Alexander v. State, 601 So.2d 1130 (Ala.Cr.App.1992).’
“Williams v. State, 795 So.2d 753, 780 (Ala.Crim.App.1999). When reviewing a trial court’s jury instructions, we must view them as a whole, not in-bits and pieces, and as a reasonable juror would have interpreted them.’ Johnson v. *874 State, 820 So.2d 842, 874 (Ala.Crim.App.2000).”
163 So.3d at 457. Kirksey is correct when he argues that “[i]t is the preferred practice to use the pattern jury instruction[s]” in a capital case. (Kirksey’s brief, p. 35) (quoting Stewart v. State, 730 So.2d 1203, 1211 (Ala.Crim.App.1996)). It is not, however, required-that circuit courts, do so. Our review of the record demonstrates that the trial court correctly instructed the jury on capital murder. - Thus, no error occurred. ..
C.
Kirksey complains that the prosecutor compounded the problem with the alleged erroneous jury instructions through comments made during rebuttal opening argument and rebuttal closing argument. Specifically, Kirksey complains that, during rebuttal opening argument, the prosecutor said-: “And I think that when [the court] tells you — when [the court] .defines what intent is, intent is where you intend to engage in the conduct. It doesn’t necessarily mean the result. The conduct.” (R. 1281)(emphasis in original). Kirksey did not object to the prosecutor’s statements. During rebuttal closing argument, the prosecutor said: “Now, the judge is going to tell you what intent is for purposes of murder. And he’s going to mention something about the intent to cause the result or — or engage in the conduct.” (R. 2138) (emphasis in original). Again, Kirksey raised no objection to the statements made by the prosecutor.
The trial court, however, instructed the jury that “[attorney’s statements] are not evidence and you should disregard any remark, statement' or argument which is not supported by the evidence or by the law as given to you by the Court.” (R. 2147-48.) Because we “presume that the jury follows the trial court’s instructions unless there is evidence to the contrary,” Cochran v. Ward, 935 So.2d 1169, 1176 (Ala.2006), any harm from the prosecutor’s statements was eliminated by the court’s instructions. We find no error.
XVII."
Kirkséy hext argues, in his third issue, that the trial court erred in not granting his request that the court'instruct the jury that voluntary intoxication can negate the element of specific intent. He asserts first that evidence was sufficient to justify such a charge being given to the jury. Kirksey then contends that the alleged error undermined the reliability of his conviction. Because' Kirksey did not object to the court’s failure to give the requested instruction,' we review this claim only for plain error. See Rule 45Á, Ala. R.App. P.
/.A.
“Intoxication” is defined in § 13A-3-2(e)(1), Ala.Code 1975, as “including] a disturbance "of mental or physical capacities resulting from the introduction of any substance into the body.”
“ ‘ “A charge on intoxication should be given if ‘ “there is an evidentiary foundation in the record sufficient for the jury - to entertain a reasonable doubt” ’ in the element of intent. Coon v. State, 494 So.2d 184, 187 (Ala.Crim.App.1986)(quoting Government of the Virgin Islands v. Carmona, 422 F.2d 95, 99 n. 6 (3d Cir.1970)). See also People v. Perry, 61 N.Y.2d 849, 473 N.Y.S.2d 966, 966-67, 462 N.E.2d 143, 143-44 (App.1984) (‘[a] charge on intoxication should be given if there is, sufficient evidence of intoxication in the record for a reasonable person to entertain a.doubt as to the element of intent on that basis’). An accused is entitled to have the jury consider the issue of his intoxication where the evidence of intoxication is *875 conflicting, Owen v. State, 611 So.2d 1126, 1128 (Ala.Crim.App.1992); Crosslin v. State, 446 So.2d 676, 682 (Ala.Crim.App.1983), where the defendant denies the commission of the crime, Coon v. State, 494 So.2d at 187; see Moran v. State, 34 Ala.App. 238, 240, 39 So.2d 419, 421, cert. denied, 252 Ala. 60, 39 So.2d 421 (1949), and where the evidence of intoxication is offered by the State, see Owen v. State, 611 So.2d at 1127-28.”
“ ‘Pilley v. State, 930 So.2d 550, 561-62 (Ala.Crim.App.2005).
“‘However, the court should charge on voluntary intoxication only when there is a sufficient evidentiary foundation in the record for a jury to entertain a reasonable doubt as to the element of intent. Ex parte McWhorter, 781 So.2d 330, 342 (Ala.2000), In Pilley this Court provided guidance as to what evidence would be required to form that eviden-tiary foundation.
“‘“The Alabama Legislature has defined ‘intoxication’ to include ‘a disturbance of mental or physical capacities resulting from the introduction of any substance into the body.’ § 13A-3~2(c)(l), Ala.Code 1975. . Thus, evidence that the defendant ingested, alcohol, or drugs, standing alone, does not warrant a charge, on intoxication. ‘[Tjhere must be evidence that the ingestion caused a disturbance of the person’s mental or physical capacities and that that mental or physical disturbance existed at the time the offense was committed.’' Lee v. State, 898 So.2d 790, 838 (Ala.Crim.App.2001) (opinion on return to remand), cert. denied, 898 So.2d 874 (Ala.), cert. denied, 543 U.S. 924, 125 S.Ct. 309, 160 L.Ed.2d 222 (2004). See also Maples v. State, 758 So.2d 1, 23 (Ala.Crim.App.), aff'd 758 So.2d 81 (Ala.1999). Such a holding is consistent with this Court’s opinion in Windsor v. State, 683 So.2d 1027, 1037 (Ala.Crim.App.1994), aff'd, 683 So.2d 1042 (Ala.1996), in which we stated:
“ ‘ “ ‘In this case, however, there was no evidence that the appellant was intoxicated. Although there was evidence that the appellant had been drinking beer on the day of the -robbery-murder, there was no evidence concerning the quantity of beer he consumed that day at the time of the murder. Evidence that someone was drinking an alcoholic beverage is not evidence that that person was intoxicated. There was no “reasonable theory” to support an instruction on intoxication because there was no evidence of intoxication. The court did not err in not instructing the jury on intoxication and manslaughter where there was no evidence that the appellant was intoxicated at the time the robbery-murder occurred.’ ”
“ ‘Pilley, 930 So.2d at 563.’ ”
Spencer v. State, 58 So.3d 215, 231-32 (Ala.Crim.App.2008) (quoting Harris v. State, 2 So.3d 880, 911 (Ala.Crim.App.2007)). The appellant in Spencer had,-at trial, “presented evidence that he had ingested narcotics and alcohol the night before [and the morning of] the shootings [of four Birmingham police officers].”' Spencer, 58 So.3d at 232. He did not, however, “claim to be intoxicated at the time .of the shootings,” Id. In affirming the trial court’s- decision to not instruct the juiy on voluntary intoxication and the effect it has on forming a specific intent, we concluded:
“There was simply insufficient evidence fromwhich, a jury could have found beyond a reasonable doubt that Spencer was unable to form the requisite intent to commit capital murder, because he was ■ experiencing ‘a disturbance of mental or physical capacities,’ *876 resulting from drug or alcohol use at the time of the murders.”

Id.

-[38] A review of the evidence in this case compels us to conclude that the trial court correctly refused Kirksey’s request for an instruction on voluntary intoxication negating specific intent. Although there was evidence indicating that Kirksey had been drinking, none of it adequately established that he was intoxicated to such an extent as to justify an instruction on voluntary intoxication. The day after the murder, Kirksey told Det. Farris that, before Cornell was injured, he had consumed five beers and that he had not eaten anything. Two days later, on April 18, 2006, Kirksey informed Det. Farris that he had “more like eight beers” before Cornell was injured and that, because he had not eaten anything, he had been “drinking on an empty stomach.” (R. 1509.) He also included that information in the written statement he gave Det. Farris that day. At trial Kirksey testified that, on April 15, 2006, he had only two beers and denied that he had consumed eight beers on that date.
The only other evidence that established Kirksey had been drinking on April 15, 2006, came when Det. Farris testified that, while speaking with him at the apartment that afternoon, she noticed the' smell of alcohol.[18]
We recognize that, on April 18, 2006, Kirksey claimed to have consumed eight beers on the day Cornell was injured and stated that “it was like [he] was someone else.” (C. 233.) However, “the other evidence as to his condition at the time of the crime was totally consistent-with the proposition that he was sober.” Ex parte McWhorter, 781 So.2d 330, 342 (Ala.2000). In' McWhorter, the Alabama Supreme Court held
“that [the appellant’s] self-serving statements suggesting he was intoxicated at the time of the killing, statements made in his internally inconsistent interview by Detective Maze, is, as a'matter of law, insufficient to satisfy the rigorous standard of showing that the intoxication relied upon to negate the specific intent required for a murder conviction amounted to insanity.”
Id,[19] This was because “the evidence offered by McWhorter as to his alleged intoxication was glaringly inconsistent with his own statement giving detailed descriptions of the events occurring at the crime scene.” Id.
In this case, Kirksey’s actions support the trial court’s decision to deny the request for a voluntary-intoxication instruction. Following the infliction of injuries on Cornell, Kirksey ran down the stairs and ■informed Yolanda of Cornell’s condition. He then' returned up the same stairs, where Yolanda later found him performing CPR on Cornell. When speaking with the emergency medical personnel, Kirksey denied knowledge of what had happened to Cornell, telling them’that Cornell'-was on the floor when Kirksey returned from the bathroom.'
Yolanda testified that she did not clean up the puddle of blood she saw on the *877 bedroom floor. Photographs of the bedroom do not show any blood on the floor, and Det. Farris said that she did not notice blood on anything other than the washcloth and T-shirt that were collected. Kirksey stayed at the apartment when Yolanda went to the hospital; this gave him the opportunity to clean the blood from the floor.
Further, after returning to the apartment, Kirksey was arrested, not for public intoxication but, rather, for failure to appear for a hearing on traffic citations. When Kirksey first spoke with Det. Farris, he denied knowing what had happened to Cornell, but, during his final interview with her, he gave “detailed descriptions of the events occurring at the crime scene.” McWhorter, 781 So.2d at 342.
We hold that sufficient evidence was not adduced at trial to justify charging the jury on voluntary intoxication and that the trial court did not err in refusing to give such a charge.
B.
Having held that, as a matter of law, it was not error for the trial court to refuse instructing the jury on voluntary intoxication, we also conclude that Kirksey’s argument that the alleged error undermined the reliability of his conviction is without merit.
XVIII.
Kirksey next argues that the “evolving standards of decency” have rendered Alabama’s method of execution unconstitutional and that his “death sentence constitutes cruel and unusual punishment.” (Kirk-sey’s brief, pp. 100-01.)
We considered and rejected a similar argument in McCray v. State, 88 So.3d 1 (Ala.Crim.App.2010). In that case, we noted that Alabama’s lethal-injection protocol was substantially similar to Kentucky’s, which was upheld by the United States Supreme Court in Baze v. Rees, 553 U.S. 35, 128 S.Ct. 1520, 170 L.Ed.2d 420 (2008). Kirksey’s claim is, therefore, without merit.
XIX.
Finally, Kirksey argues that the cumulative effect of the errors committed at trial requires reversal of his conviction.
“• ‘ “The Alabama Supreme Court has set forth the cumulative-error rule as follows: ‘[Wjhile, under the facts of a particular case, no single error among multiple errors may be sufficiently prejudicial to require reversal under Rule 45, if the accumulated errors have “probably injuriously affected substantial rights of the parties,” then the cumulative effect of the errors may require reversal.’ Ex parte Woods, 789 So.2d 941, 942-43 n. 1 (Ala.2001)(quoting Rule 45, Ala. R.App. P.).”
Brown v. State, 56 So.3d 729, 743 (Ala.Crim.App.2009) (quoting Sharifi v. State, 993 So.2d 907, 946-47 (Ala.Crim.App.2008), quoting in turn Lewis v. State, 24 So.3d 480, 538 (Ala.Crim.App.2006)).
Applying this standard to Kirksey’s allegation of cumulative error, we have reviewed the record and find no evidence that the cumulative effect of any of the individually nonreversible errors in this case affected his substantial rights at trial.
XX.
As we are required to do under § 13A-5-53, Ala.Code 1975, we now address the propriety of Kirksey’s capital-murder conviction and his sentence of death. Kirksey was indicted for, and was convicted of, murdering Cornell, who was less than 14 years of age, a violation of § 13A-5-40(a)(15), Ala.Code 1975. The jury unanimously recommended that Kirk-sey be sentenced to death. The trial court followed the jury’s recommendation and sentenced Kirksey to death. The record demonstrates that Kirksey’s sentence was *878 not imposed under the influence of passion, prejudice, or any other arbitrary factor. . See § 13A-5-53(b)(l), Ala.Code 1975, The trial court found one aggravating circumstance, that the “capital offense was especially heinous, atrocious, or cruel compared to other capital offenses,” pursuant to § 13A-5-49(l), Ala.Code 1975. The trial court found the existence of one statutory mitigating - circumstance, that Kirksey had no “significant history of prior criminal activity,” pursuant to § 13A-5-51(-l), Ala.Code 1975. The trial court also found and considered several nonstatutory mitigating circumstances, noting that “[e]ach fact and circumstance offered in mitigation was accepted and considered by the Court as valid and accorded due weight in the sentence in this case.” (R. 2343.)
Having independently weighed the aggravating and mitigating circumstances, as we are required to do by § 13A — 5—53(b)(2), Ala.Code 1975, this Court is convinced, as was the trial court, that the sentence of death wais the appropriate sentence in this case.
We are also convinced that Kirksey’s death sentence is neither disproportionate nor excessive when compared to the penal-tiés imposed in similar cases. See Blackmon v. State, 7 So.3d 397 (Ala.Crim.App.2005); Minor v. State, 914 So.2d 372 (Ala.Crim.App.2004).
Lastly, as we are required to do by Rule 45A, Ala. R.App. P., this Court has searched the record for any error that may havé affected Kirksey’s substantial rights, and we have found none. ' ' .
For the forgoing reasons, we affirm Kirksey’s capital-murder conviction and his sentence of .death.
AFFIRMED.
WINDOM, P.J., and'WELCH, KELLUM, BURKE, and JOINER, JJ., concur in .the result. , .

. "Agonal” is defined as "of, relating to, or associated with agony and esp. the death agony.” Merriam-Webster's Collegiate Dictionary 25 (llthed.2003).

. ■ At trial, Colegrove did not recognize anyone in the courtroom as being the black male with whom he spoke that day.

. The Barrie Center for Children is the child-advocacy center in Etowah County.

. "Nail” was Cornell's-nickname.

. Although Kirksey described the item as an “article” (C. 86), it appears to be a commen-taiy and includes a link reading “[b]ack to article.”

. This is issue number 17 in 'Kirksey’s brief.

. This is issue number 16 in Kirksey’s brief.

. Although- here the record reflects the name of potential juror S.N., it is apparent from the balance of this portion of the transcript that the potential juror on individual voir dire is actually B.N.

. "Disparate treatment would occur when all the jurors give similar answers to the same questions, yet one group is struck on the basis of that answer while another is not. See'JSx parte Branch, 526 So,2d 609, 624 (Ala.1987).” Taylor v. State 808" So.2d 1148, 1164 (Ala.Crim.App.2000).

. Although Kirksey argues that, when giving its reasons for striking Es.D., the State mis-characterized her comments by claiming that Es.D. had said that “she was continually having chest pains,” the State immediately clarified the reasoning and noted that Es.D. had gaid "that whenever she got hot or she was in a crowd or she was stressed, that she had chest pains." The State’s reasoning, therefore, was not based on a mischaracterization of Es.D.’s statements.

. This is an apparent reference to a Form 1593, used to comply with the mandatory reporting requirements regarding child abuse, codified in § 26-14-3, Ala.Code, 1975.

. Pointer v. Texas, 380 U.S. 400, 85 S.Ct. 1065, 13 L.Ed.2d 923 (1965).

. Although Kirksey made several statements to law enforcement on those dates, he did not list, a specific number, of statements he sought to have suppressed.

. We are not unmindful of Justice John-stone's special concurrence in Ex parte Wilson, 777 So.2d 935 (Ala.2000), cited by Kirk-sey, and stating that “courts cannot.... hold that jurors need expert assistance tp apply [the heinous, atrocious, or cruel] standard.” Ex parte Wilson, 777 So.2d at 936 (Johnstone, J., concurring specially). We also recognize that, under § 12-3-16, Ala.Code 1975, "[t]he decisions of the Supreme Court shall govern the holdings and decisions of the courts of appeals....” The "decisions of the Supreme Court” in that statute, howevdr, "can only mean the 'decisions of the majority' of. the Supreme Court,” Willis v. Buchman, 30 Ala.App. 33, 40, 199 So. 886, 892 (1940) (opinion after remandment) (interpreting Code 1923, § 7318).

. Although we recognize that, in Broadnax, we discussed comments 'made during argument and that some of the comménts of which Kirksey complains were made-during voir dire, we also recognize that one purpose of voir dire is to acquaint the jury with the type of case before it. See, e.g., Taylor v. State, 666 So.2d 36, 62 (Ala.Crim.App.1994).

. Although, in his brief, Kirksey asserts that he did object to the prosecutor handing tissues to Det. Farris, the record shows that he did not object but, rather, merely ’’ask[ed] the district attorney’s office and any employee of the district attorney’s office to refrain from, in open court, taking tissues to anyone.” (R. 1583.)

. Det. Farris, who had recently married, had previously been known as'"Teri Davis.”

. State’s Exhibit 15 was a photograph of beer bottles and a Pepsi can in a garbage can in the bedroom of the apartment. No evidence, however, established who put those items in the garbage can or how long they had been there.

. Although the trial-court judge in McWhorter charged the jury on voluntary intoxication, the Alabáma Supreme Court wrote that, "[bjecause there was no substantial evidence indicating that at the time of the crime McWhorter was intoxicated to such á degree that the intoxication-amounted to insanity, the trial court's voluntary-intoxication charge was neither prejudicial nor necessary.” McWhorter, 781 So.2d at 343,